JOHN HACKETT *v.* BENJAMIN CALLENDER, EMERSON R. WRIGHT AND ROYAL FLINT, *and the Administrators of the Estate of* JOHN HACKETT, SENIOR, *deceased.*

### (IN CHANCERY.)

*Chancery. Reasonable inquiry. Execution. Notice.*

H. purchased and paid for land of which he took and kept the open and public possession, but the deed was taken in the name of F. E., an attorney, having demands against H. in his hands for collection, inquired of the latter

if he owned the land, and he replied in the negative. Subsequently E., having received a demand against F. for collection, and desiring to secure it by an attachment of the same land, inquired of H. if he owned it, and received the same reply, but he did not disclose to H. his purpose in making the inquiry, and intended not to do so. E. then caused the land to be attached and levied upon as the property of F.; *Held*, that the possession of the land by H. was sufficient notice of his equitable interest therein to put the creditors of F. upon inquiry before attaching it; and that under the circumstances, the last inquiry by E. of H., in regard to the title of the land, was not properly made, and that H.'s answer did not rebut the presumption of notice of his equitable interest raised by his possession of the land.

When a person is inquired of as to a matter in respect to which his answer may affect his pecuniary interests, he has a right to know whether the person making the inquiry has an interest which entitles him to make it, and what the object of the inquiry is, and that his answer will be relied upon. Unless correctly informed upon these points his answers will not affect his legal rights or pecuniary interests.

If an attaching creditor has notice after his attachment but before levy, that the land attached does not belong to the debtor but to another person, though the record title is in the debtor, such notice, if true, will be sufficient to protect the equitable interest of the real owner against the levy.

The bill set forth that on the 2d of January, 1849, the orator purchased of the administrator of the estate of one I. W. Cushman certain lands in Middlebury, and paid for the same ; that the orator's father, John Hackett, senior, and Royal Flint assisted the orator in raising a portion of the money to pay for such purchase, by signing with him, as his sureties, a note payable to one Darling, and another note payable to the Bank of Middlebury ; that for the purpose of securing his father and Flint for becoming his sureties upon these notes he caused the deed of the land to be executed to them instead of to himself, under the agreement that the land should be held by them in the first instance as such security, and secondly in trust for the orator, and that they should convey the land to him upon his paying the notes signed by them as sureties ; that the deed of said land to Flint and Hackett, senior, was duly recorded ; that the orator entered into possession of the land at the date of that deed, and had ever since continued in possession thereof, had paid all the taxes thereon, and made improvements upon the same ; that the orator had paid the note to the Bank of Middlebury, and was ready and willing to pay the note to Darling, as soon as the administrators of Hackett,

senior, would execute to the orator a deed of their intestate's interest in said land; that Flint, on the 15th of January, 1852, quitclaimed all his title and interest in said land to your orator, by a deed of that date duly acknowledged and recorded; that the defendant Callender, by the defendant Wright, as his attorney, on the 5th of January, 1852, commenced a suit in his favor, upon a pre-existing debt, against Flint, who was then insolvent, and therein attached all the land in Middlebury as Flint's property, in which suit he recovered judgment against Flint at the December Term, 1852, of the Addison county court, upon which an execution was issued, which, on the 21st of March, 1853, was levied upon a fractional portion of an undivided half of said land; that the defendant Wright, having in his hands, as attorney for Callender, another claim in favor of the latter against Flint, brought a suit thereon in his own name against Flint, on the 5th of January, 1852, returnable before a justice of the peace, and therein also attached all the land in Middlebury as the property of Flint; that judgment was rendered on the 19th of March, 1852, in this suit in favor of Wright against Flint, and an execution was issued thereon, which, on the 21st of March, 1853, was also levied upon a fractional portion of an undivided half of said land; that Callender commenced an action of ejectment against the orator on the 1st of December, 1853, to recover the land on which his execution was levied as aforesaid, which action was pending when the bill in this case was brought; that Wright had also commenced an action of ejectment against the orator to recover the land included in his levy, which was also pending, and that the orator was in danger of losing the title to his land by the judgment of the court of law in which these actions of ejectment were pending, for the reason that the record title of said land was in Flint and Hackett, senior, as aforesaid; that both of said judgments and levies belonged in fact to the defendant Callender, and that both of said actions of ejectment were brought in his behalf and for his benefit; and that before the commencement of the said suits against Flint in favor of Callender and Wright, the latter had notice that the land in question was held by Hackett, senior, and Flint in trust for the orator, and that the orator claimed it as his own.

The bill prayed for a decree that Callender and Wright should be enjoined from prosecuting their actions of ejectment for the land in question, and should release to the orator all claim to the land embraced in their levies; that Flint and the administrators of Hackett, senior, should convey to the orator the said land upon the payment by the orator of the note held by Darling, and for further relief, etc.

From the answers of the defendants and the testimony in the case, it appeared that all the allegations in the bill were sustained except that Wright in his testimony denied any notice to him, previous to the commencement of the suits against Flint, that Flint and Hackett, senior, held the title to the land in question merely in trust for the orator.

The material portion of Wright's testimony was that in May, 1849, having certain demands in his hands for collection against the orator, the latter informed him that he had no interest in the land in question; that in January, 1850, in a conversation with the orator about certain claims against him, the latter repeated that he did not own the lands in controversy; that in 1852, and a few days before the attachments of the land were made in the suits against Flint, Wright, having the Callender demands in his hands for collection, inquired of the orator if he had any claim or title to the land deeded by the administrator of Cushman to Hackett, senior, and Flint, and that the orator replied that he had not, and that if Wright did not believe it he could go to the town clerk's office, or the administrator of Cushman, and ascertain the fact; and that at that time Wright was aware that the orator was occupying the premises in question.

On cross-examination Wright testified that in this last conversation with the orator he did not give him to understand that he held any demands against Flint, and that he made no disclosures to him of his purpose in making the inquiry in regard to the ownership of the land, and that it was his object not to make any. It appeared that at the time of the two first conversations about the land between Wright and the orator, the former did not have the Callender demands against Flint in his hands for collection. It also appeared that the copies of the writs of *Callender* v. *Flint* and *Wright v. Flint,* were not delivered to Flint until the 15th of

January, 1852, and that on that day Flint notified Wright that he had no interest whatever in the land in question, except for the purpose of security for signing the Darling note for the orator. It also appeared that the Darling note had been paid by the administrators of the estate of John Hackett, senior.

The Chancellor, BENNETT, J., at the December Term, 1858, in Addison county, dismissed the bill as to Wright and Callender, with costs, and decreed that upon the payment by the orator to the administrators of the estate of John Hackett, senior, of the amount due from him to that estate within ninety days, the said administrators should deliver to the orator a quitclaim deed of the land in question from the heirs of John Hackett, senior, to the orator, excepting such portions of the land as were embraced in the Callender and Wright levies; and that they should recover costs of the orator.

From this decree the orator appealed.

*Linsley & Prout* and *E. J. Phelps*, for the orator.

I. There was sufficient notice of the trust in favor of the orator to exempt the property from attachment on the debts of the trustee.

1. The possession of the orator was of itself sufficient notice. Especially in connection with the acts of ownership on his part, and the absence of any claim or interference by those who held the title; *Pinney* v. *Fellows*, 15 Vt. 325, and cases there cited.

2. Flint gave actual notice to Wright before the attachments were completed that the property belonged to the orator.

3. Before any judgment or levy under the attachments, Flint conveyed to the orator.

In view of all these facts it cannot be doubted *and is not denied,* that Wright knew that the land did not belong to Flint.

II. The orator is not estopped by what he is claimed to have said to Wright, from showing the truth in regard to the title to the land.

1. We deny that the testimony of Wright, himself a defendant and the attorney of the other defendant, is sufficient to prove these statements. The conversation took place under circumstances that strongly discredit the witness. The clearest proof should be required before a party should be held estopped. Evidence in

Hackett v. Callender et al.

regard to admissions, obtained in casual conversation, by an interested witness seeking to make testimony against a person unsuspicious of his object, is the least reliable of any that is ever heard in a court of justice, and the very last that ought to be held sufficient to estop a party from showing what is conceded to be the truth.

It will be observed that an addition of only a word or two by way of strengthening, makes the entire difference between what the orator is claimed to have said on this occasion and the strict truth.

2. The orator was not made aware that his statement to Wright was in any way to be acted on, nor for what purpose, nor in whose behalf the inquiry was made. On the contrary, the object of the conversation was sedulously concealed, and he was led to believe that it had reference to a different subject, and different parties.

We deny that a statement so obtained and so made, was ever held to estop a party from proving the contrary. It is the very essence of an estoppel of this character, that the statement relied on is made in order to induce an innocent party to act on it to his detriment, or at least with knowledge that it will be so acted on. In such case the statement becomes an intentional fraud, and the party making it must abide the consequences. But nothing short of this will ever operate as an estoppel; 2 Smith's Lead. Cases, 564 ; *Lazell* v; *Odle*, 3 Hill 215 ; *Whitaker* v. *Williams*, 20 Conn. 98 ; *Steele* v. *Putney*, 3 Shepley, 327 ; *Hicks* v. *Craw*, 17 Vt. 374 ; *Strong* v. *Ellsworth*, 26 Vt. 374.

The rule contended for by the defendants necessarily goes the length of holding every untrue statement, under whatever circumstances made, a perpetual estoppel thenceforth upon the party making it, from ever proving the truth of the matter in a court of justice, however or with whomsoever the question may arise.

3. The defendants have lost nothing by the orator's alleged statement, and are therefore not authorized to claim it as an estoppel. The principle only extends in favor of those who would suffer by such a false statement if the party were afterward permitted to retract and contradict it.

The debts against Flint were old and worthless. The attachments were not made in consequence of the orator's statement, but the statement was ingeniously obtained (if at all) in aid of the proposed attachments. If they finally prove unavailable, the

defendants have lost nothing whatever by the experiment. It is not pretended that they could meanwhile have secured their debts in any other way. A mere fruitless attachment, without other detriment, is not sufficient to entitle the defendants to claim an estoppel; *Pinney* v. *Fellows*, above cited.

*L. E. Chittenden, J. W. Stewart* and *E. R. Wright,* for the defendants Callender and Wright.

I. The title to an undivided moiety of the premises in question, at the time of the attachment, stood upon the record in the name of Flint, the execution debtor. It was attached by the creditor without any notice of the orator's equity, (if he has any equity.) The case must be determined upon the facts as they stood *at the time of the attachment,* for it is *then* that the lien of the execution creditor commences and is acquired. Subsequent notice of an equitable title cannot affect him; *Carter* v. *Champion*, 8 Conn. 549; *Stanley* v. *Perley et al.*, 5 Maine 369; *Kent et al.* v. *Plummer*, 7 Maine 464; *Emerson* v. *Litchfield*, 12 Maine 148; *Slocum* v. *Catlin et al.*, 22 Vt. 137.

The *onus* is then thrown on the orator of showing such facts as will protect the premises from attachment as the property of Flint. He can only do this by showing notice of his equitable interest to the creditor before the attachment, or what is in law equivalent thereto.

1. He has shown no such notice.

2. The only fact upon which he can rely which shall have the effect of notice is *his possession* of the premises at the time of the attachment.

This fact may amount to *implied* notice that the orator was *rightfully* the possessor; *Rublee* v. *Mead*, 2 Vt. 544; *Green et al.* v. *Slater et al.*, 4 Johns. Ch. 46.

It is no notice whatever of the *extent* of the orator's title. It is only available to put the attaching creditor *upon inquiry* after the title or right of the orator, that upon such inquiry its extent may be ascertained; *Pope* v. *Henry*, 24 Vt. 565; *Rogers* v. *Jones*, 8 N. H. 264; *Pinney* v. *Fellows*, 15 Vt. 541; *Crofton* v. *Ormsby*, 2 Sholes & Sepoy 599.

The fact of possession admits of other explanation than the

*prima facie* one of ownership. The possession of the orator in this case might have well been *under* Flint, as tenant or otherwise. If therefore the party in possession, upon inquiry by a creditor about to attach, *denies* his interest in the premises, and asserts the ownership to be where the record evidence leaves it, the possession is *explained.* It ceases to be notice, and the creditor may go by the record; *Rogers* v. *Jones, supra.*

In this case the orator (being in possession) is asked whether he has any interest in the premises, and he disclaims ownership, referring the agent of the execution creditor to the *record* for the state of the title; the place to which he would be referred by the law. If the orator is not technically *estopped* by these acts, at least, the effect of his express disclaimer must be to overcome the implied notice of his possession.

The defendant, as an attaching creditor, stands on the same footing as a purchaser; *Carter* v. *Champion, supra; Bigelow* v. *Topliff,* 25 Vt. 273; *Burnell* v. *Bobertson,* 5 Gilman 282; 10 U. S. Dig., 54 sec. 41.

Parties standing otherwise equal, the legal shall prevail over the equitable estate. The orator's claim rests upon a supposed fraud in the defendant in undertaking, with knowledge of the facts, to defeat his equitable title; *Pomroy* v. *Stevens,* 11 Met. 244; *Spofford* v. *Weston,* 29 Maine 140.

The defendant was bound to inquire; he did inquire. He acted according to the information received, and this is the fraud!

*E. N. Briggs,* for the administrators of the estate of John Hackett, senior.

ALDIS, J. The evidence shows that the legal estate and record title to the premises in question were vested in Royal Flint and John Hackett, sen., but that John Hackett, jun., the orator, was the real owner. About the time that the orator bought the land and had it conveyed to Flint and his father, which was in January, 1849, he went into possession of it and so remained in possession, exercising acts of ownership, up to the time that the defendants Callender and Wright attached the land as the property of Royal Flint. They attached the land by leaving a copy in the town clerk's office on the 5th of January, 1852, and on the 15th of

January they completed their attachments by serving a copy on Flint. Thus at the time of the attachments Royal Flint appeared of record as the owner of half of the land, while the orator was in possession and was the equitable owner of the whole. Wright and Callender obtained judgments in their suits against Flint, and on the 21st of March, 1853, levied their executions upon one-half of the land as the property of Flint.

As the orator was in possession before and at the time of the attachment, his possession was so far, at least, notice to Wright and Callender of his equitable interest, as to put them on inquiry. They claim to have made all such inquiry of him as to his rights and title in the land as the law requires; and that in reply to such inquiry the orator stated that he had no claim to the premises whatever, but that they belonged to his father and the said Royal Flint; and that the defendants Wright and Callender, relying on this assurance of the orator, and without any notice of his equitable interest, made their attachments. They claim that their attachments so made are valid and binding to hold the land as the property of Flint.

The orator claims that the inquiry was not properly made of him; that the purpose and object of the defendants in making the inquiry was concealed; and that the answers were either so obtained by artifice, or given by the orator in heedlessness, ignorance, or by being misled, that they should not be held to rebut the evidence of notice arising from his possession, or be regarded as a binding denial by him of his equitable interest.

Upon these conflicting claims of the orator and the defendants the first question in the case arises.

When a person is put upon inquiry it is his duty to pursue the inquiry with reasonable diligence, and an honest desire to ascertain the real truth. He should do nothing to avoid the truth. He should not omit or conceal anything so that the party inquired of may be thereby misled, or may have his attention directed to some object or interest which might tempt him to conceal the truth or to speak a falsehood. To so mislead the party, or, consciously to allow him to be so misled to the statement of a falsehood, would be an artifice, which should deprive the inquirer of any benefit from the information so obtained.

When a person is inquired of as to a matter in which his answer may affect his pecuniary interests, he has a right to know whether the person making the inquiry has an interest which entitles him to make it, and what the object of the inquiry is, and that the answer will be relied upon. When he fairly and fully understands that the inquiry is entitled to a truthful reply, and that the reply may be acted upon, then he is bound to answer according to the truth ; and if he answer falsely or inaccurately it is at his peril.

But when he is not apprised of the rights and objects of the party inquiring, when he may think that mere inquisitiveness or idle or impertinent curiosity prompt the question, then his answers ought not to be held to affect his legal rights or pecuniary interests.

Idle or impertinent questions relative to one's private affairs, often fail to receive either respectful attention or accurate reply. Men who are honest and truthful either do not answer them at all, or else answer so as rather to get rid of the inquirer than to furnish accurate information. Some perhaps, acting upon a more questionable theory in morals, that one is not bound to speak the truth where the other has no right to ask the question or to expect an answer, according to truth, would not hesitate to reply with a falsehood. Between such idle questions and reasonable inquiries springing from the necessities of business and directed to proper objects, there is a wide difference.

Hence, when one is put upon inquiry it is his duty to see to it that the person inquired of fairly understands that the inquirer has a right to put the question, and what the object of it is, and that the information sought for will be relied upon, and that he may not be led to suppose that it is an idle, impertinent or casual question, in answering which he is not bound to accuracy and truth. Fair dealing, we think, requires that these principles should be observed.

In applying them to this case we must rely wholly on the testimony of Mr. Wright.

It appears that some time previous to the making of the attachments, Mr. Wright had demands against the orator left with him for collection. Upon two occasions, in 1849 and December, 1850, having debts against Hackett to secure, he inquired of the

orator as to his interest in or title to this land, and was informed, substantially, that it belonged to Flint and Hackett, senior. About a year after the last of these conversations, and a few days before the attachments, Wright, desiring to collect debts against Flint, who had failed, again inquired of the orator if he had any claim or title to the land. On cross examination he says he did not give Hackett to understand that he held any demand against Flint; that he made no disclosure whatever to Hackett, and that it was his object not to make any. From this statement of Wright's it is plain that Hackett could not have known what was the purpose of the inquiry, or that Wright had any reasonable cause for making it, or would rely or act upon the answer he might obtain. Indeed, he might very naturally recur to his former conversations with Wright, and suppose that he made the inquiry for the purpose of finding out whether he could not attach it on a debt against himself. Mr. Wright might have foreseen, if his attention had been called to the matter, that Hackett would recur to the former conversations with him, and that he would be likely to give the same answer as before, unless the object of making the inquiry, viz, that he wished to secure a debt against Flint, was communicated to him. And in connection with these circumstances we are to bear in mind that Mr. Wright purposely concealed from him his object in making the inquiry. The concealment of his purpose by Wright, though not intended as an artifice to entrap Hackett into a false admission, had the effect of making him heedless as to his reply. We think the manner in which this inquiry was pursued falls much below the reasonable requirements of the law.

Mr. Wright knew the record title was in Flint, and the possession in Hackett, and that he was bound to inquire as to the meaning of such possession, and whether Flint was the real owner. If he had told Hackett "I have a debt against Flint which I wish to secure, and I wish to know whether you have any interest in this land of which you are in possession, or whether it really belongs to Flint, as it appears of record," we think he would then have so conducted the inquiry as to bind Hackett by his answers. But as the case stands, we think the answer of Hackett does not rebut the presumption of notice which

the law raises from his possession ; that it is the same as if no inquiry whatever had been made by the defendants.

Another point has been made and argued, and upon which, as the court all concur, we deem it proper to. express our decision.

After the attachment and before the levy of the defendants' executions, the defendants were notified of the equitable title and interest of the· orator. The debt of the defendants against Flint does not appear to have been contracted by Callender relying upon Flint's ownership of the land. The question is therefore raised that Callender, as an attaching creditor, does not, by virtue of his attaching the land, (even if he then had no notice of the trust) acquire a lien like that of a subsequent purchaser without notice, but that his lien by attachment was defeated by the actual notice which he received before the levy.

In the opinion of Judge ISHAM in *Bigelow & Wife* v. *Topliff*, 25 Vt. 273, it is said that the lien of attaching creditors has always been considered in this State as creating an equitable title equal to that of purchasers. We are not aware that that question has ever been decided in this State, and the expression in the opinion alluded to does not seem to have been called for by a decision of that case.

There is an obvious difference in the equities of a subsequent bona fide purchaser of land without notice of a trust, and of a creditor who attaches to secure an antecedent debt. The purchaser advances his money to buy the land. He gives a new consideration. He parts with a new value upon the credit of the apparent record title.

The attaching creditor merely seeks to secure an old debt. He advances nothing upon the strength of the record title. He is not made worse by relying upon it. The omission of the real owner to record his deed has not injured the creditor or been the means of depriving him of any value. It is for these reasons that courts generally have treated them as standing upon equities materially different. The cases cited show that a different doctrine has been held in Connecticut and Maine. The case of *Carter* v. *Champion*, 8 Conn. 549, is the leading authority to the contrary. But the court turn the case upon the reason that the creditor might select and attach property of the debtor when the secu-

rity was ample, and afterwards by notice be deprived of his security when it had become too late to obtain any other.

We think the supposition of such a case ought not to be the guide in establishing the general rule, and that practically such a case would be the exception rather than the rule. If such a case were to arise the creditor would stand upon an equity similar to that of a subsequent purchaser. He could say that by relying on the record title he had been deprived of obtaining security for his debt. So if a creditor, relying on his attachment and the record, had surrendered other securities, he might have a superior equity. But the case at bar shows no such or similar equity. It is merely the case of an attaching creditor attempting to secure an old debt against an insolvent debtor by attachment. No new value, credit or consideration are shown, no securities lost, endangered or surrendered.

Analogous decisions sustain this distinction. When goods are obtained by false pretences, the subsequent purchaser, without notice, obtains a good title to them. Not so the attaching creditor. He gets nothing by his attachment. He stands in the shoes of his debtor. This is settled by many decisions and is recognized in *Poor* v. *Woodburn et al.*, 25 Vt. 234. So in the case of purchasers, the rule is well settled in England and has been generally adopted in this country, that notice of the trust before the actual payment of the money, although it be secured and the conveyance executed, is equivalent to notice before the contract, and precludes the purchaser from paying the money and perfecting the purchase. The principle upon which this doctrine rests is to protect the interest of the *cestui's que trust* when it does not injure the purchaser. When the purchaser has paid his money and bought the legal title, he has at least an equal equity with the *cestui's que trust*, and having the legal title also, his title and equity united give him precedence. But the attaching creditor upon an antecedent debt has neither the equity nor the legal title, and notice to him of the trust before he gets the legal title by levy and so discharges his debt, should put an end to his lien as between him and the real owner.

The decree of the chancellor is reversed, and the case remanded to the court of chancery with instructions that a decree be made

to perpetually enjoin Callender and Wright from further prosecuting the actions of law mentioned in the bill, and that the orator recover his costs against Callender and Wright; and as to Darling and Cushman, administrators of John Hackett, senior, that the decree of the chancellor be affirmed with costs, except that the time of payment by Hackett, junior, to them of the amount due the estate of John Hackett, senior, be extended to ninety days from the making of the final decree by the chancellor.