Hon. LUKE P. POLAND, ⎫
Hon. ASA O. ALDIS, ⎪
Hon. JOHN PIERPOINT, ⎬ Assistant Judges.
Hon. JAMES BARRETT, ⎪
Hon. LOYAL C. KELLOGG, ⎭

---

HART, LESLIE AND WARREN *v.* THE FARMERS & MECHANICS BANK AND OTHERS.

(IN CHANCERY.)

*Trusts. Execution. Creditors. Purchasers. Chancery. Notice. Attorney.*

In the case of a mere sale and conveyance of land by the absolute owner, without notice, either actual or constructive, or any change of possession, the land is still subject to levy or attachment upon the debts of the vendor. REDFIELD, Ch. J.

Hart et al. *v.* Farmers & Mechanics' Bank et al.

In the case of the sale of personal property without a change of possession, the property is liable to be attached and levied upon by a creditor of the vendor, notwithstanding he has received notice of such sale. REDFIELD, Ch. J.

But one, who, after notice of such a sale, purchases the property of the vendor and pays him therefor, acquires no title thereto, as against the vendee. REDFIELD, Ch. J.

In regard to real estate conveyed by an unrecorded deed, the rule is the same, both as to attaching creditors and purchasers from the grantor. Neither can acquire any title, as against the grantee, after notice of the conveyance or of circumstances which would naturally put a careful and prudent man upon enquiry in a direction where he might learn the real state of the title. REDFIELD, Ch. J.

If one who has the record title of real estate, is still in fact but a trustee thereof, his creditors, though ignorant of the trust, can acquire no right to the land by attachment or levy, as against the *cestui que trust*; and a court of chancery, in cases where the trustee was in equity bound to convey the property to the *cestui que trust*, will decree a conveyance to the latter from the levying creditor.

But in many cases a *bona fide* purchaser of the land from the trustee, without notice of the trust, will acquire a better title against the *cestui que trust* than an attaching or levying creditor. REDFIELD, Ch. J.

If an attorney receive notice that the person holding the record title of land is not the real owner, but merely a trustee, one who subsequently employs the same attorney to attach and levy upon the land as the property of the trustee, will be affected by the attorney's knowledge of the real state of the title, though not communicated to him.

BILL IN CHANCERY. From the bill, answers and testimony it appeared that in 1836, Jonathan F. Scribner was agent under a *del credere* commission to sell glass for Cook, Lane & Corning of Troy, N. Y; that as such agent, in that year he sold to Benjamin Rathbone of Buffalo, N. Y., a quantity of glass on credit; that in August, 1836, Rathbone, being still indebted for this purchase, became insolvent, and that it being ascertained that he owned certain real estate in Burlington, in this State, the same was attached in a suit against him, brought in the Chittenden county court, in favor of Cook, Lane & Corning, which suit resulted in a judgment in favor of the plaintiffs therein, upon which an execution issued which was satisfied by a levy upon such real estate on the 18th of May, 1838; that this suit was brought with the understanding on the part of Cook, Lane &

Corning, that it was to be ultimately for Scribner's benefit should he pay the Rathbone debt upon his guaranty, and for their own security until he should pay that and all other debts he should owe them ; that one Charles D. Kasson acted as the attorney of the plaintiffs in the prosecution of such suit and the levy of such execution, and that the land so levied upon was not redeemed by Rathbone, nor any one claiming under him ; that in December, 1836, Scribner and Cook, Lane & Corning settled all accounts between them relative to the sales of glass by the former on such *del credere* commission, and that all the sales of glass to Rathbone above mentioned were included in such settlement and assumed by Scribner ; that in payment of the indebtedness from Scribner to Cook, Lane & Corning established by such settlement, Scribner turned out and endorsed to them certain notes under a parol agreement that when paid they should be in full satisfaction of such indebtedness, and further that when such notes were paid Scribner should have the benefit of the suit against Rathbone in favor of Cook, Lane & Corning then pending in Chittenden county, in this State, and that if Rathbone's land was obtained by the plaintiffs by means of that suit, they would, when such notes were paid, convey it to Scribner ; that such notes were fully paid about the time of the levy against Rathbone above mentioned, and before the expiration of the latter's right of redemption thereon ; that shortly after such levy, Cook, Lane & Corning claimed that an error had been made in such settlement between them and Scribner, in consequence of which, notwithstanding such settlement, Scribner was still indebted to them, and they refused to convey the land so levied upon until such error was corrected, and the additional amount claimed by them to be due from Scribner was paid ; that Scribner, though denying that there was any such error, and insisting that he owed Cook, Lane & Corning nothing, still did not object to their retaining the legal title and possession of the land as security for their claim against him, if any existed, until their account should be examined and finally settled ; that no further examination of the accounts between Scribner and Cook, Lane & Corning was made until 1857, after this suit in chancery was commenced, and that they were then examined by a master in chancery appointed in this

cause, who reported that there was no error in the original settlement between Scribner and Cook, Lane & Corning, and that he was not, after the payment of the notes endorsed by him to them, in any way indebted to them; that in 1839 Scribner conveyed his interest in the land upon which Cook, Lane & Corning's execution against Rathbone had been levied, together with certain lands in the State of New York, to the orators by a deed with only one attesting witness, which, however, was not recorded in the Burlington town clerk's office until 1846; that in 1842, Cook, Lane & Corning became insolvent, and that the Farmers & Mechanics' Bank, one of the defendants, to whom they were indebted, commenced in that year a suit against them in their favor in Chittenden county, and thereon caused the same land to be attached which had been taken from Rathbone by levy of execution as above mentioned; that in April, 1845, the Farmers & Mechanics' Bank, having obtained a judgment in this suit against Cook, Lane & Corning, took out execution thereon and levied it upon the land attached by them, and that the debtors did not redeem the same; that Charles D. Kasson was also the attorney of the Farmers & Mechanics' Bank in prosecuting this suit and making this levy, and that the Farmers & Mechanics' Bank had since such levy been in possession of such land, and had received the rents and profits thereof.

There was no direct evidence that the Farmers & Mechanics' Bank were actually notified before their levy of the nature of Scribner's interest in the land, or even that he claimed any interest whatever therein. The testimony was conflicting in regard to the notice which Kasson had of Scribner's claim and interest in the land.

The testimony on the part of the orators tended to show that he was aware during the pendency of the suit in favor of Cook, Lane & Corning against Rathbone, that that action was prosecuted for the benefit of Scribner, and that he was also cognizant of the nature of the settlement made between Cook, Lane & Corning and Scribner, and that Scribner had fully paid all his indebtedness to them for the security of which they were to hold the legal title of the land.

The testimony on the part of the defendants, among whose witnesses was Kasson himself, tended to show that the only

notice of Scribner's claim or interest in the land which he ever received was that he was informed during the pendency of the suit against Rathbone that Scribner was a guarantor of Rathbone's debt, and that as a lawyer he knew from the fact that if Scribner was obliged to pay that debt he would be entitled to the benefit of the land levied upon ; that afterwards between the time of the levy against Rathbone and that against Cook, Lane & Corning, Scribner stated to Kasson, who was then managing the land for his clients, Cook, Lane & Corning, that he owned the land in equity in consequence of having paid the Rathbone debt under the agreement of Cook, Lane & Corning to convey the land to him on his doing so, and that on that occasion Scribner demanded a conveyance of the property ; that he, Kasson, thereupon wrote to Cook, Lane & Corning, inquiring whether Scribner's claim was as he represented it to be, and that they replied that it was not, that they were the only owners of the land, and that they had agreed to convey the land to Scribner only on certain conditions which he had failed to perform, and that it was possible, though he had no recollection of the fact, that he communicated this claim of Scribner's, and Cook, Lane & Corning's denial of its validity, to the officers of the Farmers & Mechanics' Bank before their levy. The bill prayed that the defendants be decreed to convey the legal title in the premises in question to the orators and to account for the rents and profits.

The chancellor rendered a decree in conformity with the prayer of the bill, from which the Farmers & Mechanics' Bank appealed.

*Peck & Colby*, for the orators.

I. Scribner was a mere surety for Rathbone, and having paid the latter's debt to Cook, Lane & Corning he became in equity subrogated to all their rights and securities. This payment, under the circumstances, made the debt the property of Scribner, and gave him the right to prosecute the suit against Rathbone to judgment and execution. It became his property, and the estate levied upon was his in equity, and Cook, Lane & Corning held the legal title *in trust* for him ; *Sanford* v. *McLane*, 3 Paige 117, 122 ; *Eddy* v. *Traver et al.*, 6 Id. 521 ; 1 Lead. Cases in Equity (Ed. of 1849,) 91-2-3.

II. As between Scribner and Cook, Lane & Corning, it is obvious the former would have a right to call on the latter for a conveyance of their title to the land in question. It is equally clear that the orators stand in Scribner's shoes, and would have a right to call for a release of the title from Cook, Lane & Corning  Though the deed from Scribner to the orators has but one witness, still it passed his equitable title and gives them a footing in a court of equity.

III. But as to their title against the Bank. The Bank do not claim as purchasers, but as attaching creditors. We submit that they must stand on the title of their debtors, and if the orators' equity could be asserted against the latter, it is good as against the former. When goods are obtained by false representations, the véndor may follow and reclaim them from the hands of the vendee or of his creditor, but they cannot be recovered from a *bona fide* purchaser without notice. In such case the title passes to the vendee, otherwise he could not convey a title to a *bona fide* purchaser without notice ; yet an attaching creditor cannot hold, as the rule applied in such case is that he must stand on the title of his debtor. Why not apply this rule to the present case ?

The general rule is that trust property is not liable for the debts of the trustee. It does not pass by an assignment under the bankrupt law, nor is it bound by judgments against the trustee ; *Mitford* v. *Mitford*, 5 Vesey 87, 100 ; 10 Jur. 540 ; *Mitchell* v. *Winslow*, 2 Story 630–7 ; 2 Blackford 198 ; 4 J. J. Marshal 599 ; 1 Hilliard's abr. 227 pl. 26; *Williams* v. *Fullerton*, 20 Vt. 346.

It is only by force of our statute that title to real estate can be acquired by execution. Does trust property fall within this statute ? The language is " all houses, lands, etc., belonging to any person in *his own right*" may be levied upon. We insist that the land in question did not *belong* to Cook, Lane & Corning, in *their own right*, etc. within the meaning of the statute. The legislature cannot be supposed to have intended to subject trust property to the debts of the trustee, and the language used will exclude it. (Comp. Stat., p. 312, sec. 19 ;) *Hart* v. *Western Railroad Co.*, 13 Met. 99 ; *Quebec Fire Insurance Co.* v. *St. Louis*, 22 L. & Eq. 90 ; *Carpenter* v. *Washington Insurance Co.*, 16 Peters 495–501.

17

Take the case of the assignee of a chose in action who obtains execution and levies upon the debtor's land in the name of the assignor, for he cannot sue in his own name. Can a creditor seize and hold this land as the property of the assignor? This is the ground assumed by the defendants, and is not tenable. *In matter of Howe,* 1 Paige 125 ; *Padgett* v. *Lawrence,* 10 Paige 170 ; *Delaire* v. *Keenan,* 3 Desaus Ch. 74 ; 4 Paige 215 ; *Foster* v. *Foust,* 2 S. & R. 11 ; *Hurst* v. *Hurst,* 3 Binney 347, note ; *White* v. *Carpenter,* 2 Paige 217 ; *Veirsted* v. *Avery,* 4 Paige 9– 15 ; *Arnold* v. *Patrick,* 6 Paige 310 ; *Thompson* v. *Edelin,* 2 Har. & J. 64 ; *Burgh* v. *Francis et al.,* 1 Eq. Ab. 320 ; *Finch* v. *Earl of Winchelsea,* 1 P. W. 282 ; *Burn* v. *Burn,* 3 Ves. 576 ; 2 Story's Eq. Jurisprudence, S. 1503, b. and note ; *Whitworth* v. *Guagain,* 3 Hare 416 ; *Newlands* v. *Paynter,* 4 Mylne & Cr. 408 ; *Lodge* v. *Lysly,* 4 Sim. 70 ; *Laughton* v. *Norton,* 1 Hare 549 ; *Beavan* v. *Lord Oxford,* 35 L. & E. 267 ; *Fletcher* v. *Mowry,* 2 Story 253 ; *Wayne* v. *Hireman,* 3 Kernan 188.

Prior equities are good against judgment creditors, though they have no notice of the equity ; Dart's Vendors 398–9 ; *Whitworth* v. *Gaugain,* 1 Phillips, 19 English Eq. 728 ; 3 Hare 416 ; *Burgh* v. *Francis,* 3 Swanst. 536 n. ; *Casbird* v. *Attorney General,* 6 Price 411 ; 10 Vt. 293 ; *Prior* v. *Penprase,* 4 Paige 99 ; *Giles* v. *Grover,* 6 Bligh. N. S. 292 ; *Hackett* v. *Calender,* 32 Vt. 97 ; Adams' Equity 311, 312 ; Sugd. Vendors 423, 13 English Ed.

2. But the Bank had notice of the orator's *lien* through its agent, or of such facts as should put them on enquiry. Kasson was the agent and attorney of the Bank, and notice to an agent or attorney is notice to the principal; Sugden's Vendors, Ed. 1820, p. 534, and cases there cited.

This notice was not acquired while he was acting as attorney for the Bank, in the suit against Cook, Lane & Corning, yet this does not avoid the effect of the notice under the circumstances.

Notice to an attorney or agent, if acquired so recently before his employment by the party to be affected by it, that it is not probable that he has forgotten it, binds his principal ; *Hargraves* v. *Rothwell,* 1 Keen 154 ; *Nixon* v. *Hamilton,* 2 Dru. & W. 364, and note to 1 Keen 160 ; *Perkins* v. *Bradley,* 1 Hare 219 ;

*Mauntford* v. *Scott*, 1 Keen & Russell 157 ; see note 1 on this point 3 Russell 493 ; Adams' Equity 387, Ed. of 1855 ; Spence's Eq. Jurisp 2 vol. p. 760 ; *Tibbits* v. *George*, 5 Adol. & Ellis 197 ; Sugd. Vendors 623, 13 Eng. Ed.·

When the mortgagee employs the same attorney that has acted for the mortgagor, notice to such attorney while acting for the mortgagor will be notice to the mortgagee ; *Fuller* v. *Bennett*, 2 Hare 394 ; *Winter* v. *Anson*, 3 Russell 489.

The same rule should be applied to the present case. Kasson was the acting attorney for Cook, Lane & Corning, when he had notice of Scribner's equity. When he came to act for the Bank and attach the property, the Bank should be bound.

*Roberts & Chittenden* and *Geo. F. Edmunds*, for the Farmers & Mechanics' Bank.

1. The payment by Scribner to Cook, Lane & Corning of the Rathbone debt would give the former no right to the *property* attached in that suit. It would only place Cook, Lane & Corning under a legal liability to account to Scribner for the amount which they should recover. They would have had a perfect right to discharge the suit against Rathbone and give up the attachment at any time, without regard to Scribner's wishes ; *Bank of Montpelier* v. *Dixon*, 4 Vt. 587. The land in question was not property which Rathbone had devoted to the payment of this debt ; 2 Lead. Cases in Eq., part 2, pp 372–3–4 ; Story's Eq. Jur. 403, note 2, 499 b.

This well known rule is attempted to be evaded by the orators by setting up a special contract between Scribner and Cook, Lane & Corning, under which it is claimed Scribner acquired an equitable title to the premises.

But this agreement was both conditional and executory, and therefore, even if there had been a full performance of its conditions on Scribner's part, and a refusal to perform by Cook, Lane & Corning, Scribner would still have no right to a decree for a specific performance against them, inasmuch as it was a simple breach of contract for which an adequate compensation in damages might be had.

The contract was, when made, *executory*, and the full payment

by Scribner of his debt to Cook, Lane & Corning could not turn it into a trust until the latter had taken some steps in that direction by a delivery of possession, or otherwise declaring the trust in writing.

The contract being executory, as before shown, whatever might have been the right of Scribner, as between himself and Cook, Lane & Corning, the Bank had a right to attach the land even *with notice of the contract*, for otherwise parties could delay their contracts, the execution of which might never be completed, and which the parties could set up or rescind at their pleasure. This point will be further considered in connection with the evidence of the notice to Kasson.

2. But if, as between Scribner and Cook, Lane & Corning, Scribner had an equitable title to the property which he had transferred to the orators, the attachment of the land as the property of the persons having the legal title, must be preferred, unless the Bank, at the time of its attachment, had notice of the orators' equity, the attachment standing on the same footing as a *bona fide* purchase; *Slocum* v. *Catlin*, 22 Vt. 137; *Bigelow* v. *Topliff*, 25 Vt. 274; *Carter* v. *Champion*, 8 Conn. 549; *Stanley* v. *Perley*. 5 Maine 369; *Kent* v. *Plummer*, 7 Id. 464; *Emerson* v. *Littlefield*, 12 Id. 148; *Bailey* v. *Warner*, 28 Vt. 87.

3. The only claim of notice to the Bank is a constructive notice by reason of notice to Kasson before he was employed as their attorney. Even if Kasson received any such notice, constructive notice cannot be imputed to the Bank, as a matter of law or evidence, because the attorney employed by them to make the attachment, may have previously received it, while acting professionally for other clients. The notice to an attorney, in order to affect his clients, must be made after he had been employed to commence the suit, and *while* he is prosecuting his client's business. It then becomes operative because he is acting for, and *pro hac vice* is, the principal. It is in this respect quite analogous to the case of an ordinary agent, who is deemed to represent his principal only so far as regards, and while he is transacting, his principal's business; *Hood* v. *Fahnstock*, 8 Watts 489; *Brachen* v. *Miller*, 4 Watts & Serg. 102; *Warrick* v. *Warrick*, 3 Atk. 291; Paley on Agency 263, n.; Story on Agency 140, n.;

*Lowther* v. *Carlton*, 2 Atk. 242; *Hiern* v. *Hill*, 3 Ves. 133; *Worsley* v. *Scarborough*, 3 Atk. 362; *Fulton Bank* v. *Canal Co.*, 4 Paige 127; *Henry* v. *Morgan*, 2 Binney 497; *Preston* v. *Zubbins*, 1 Vernon 286.

The utmost length to which any well considered cases have gone in affecting clients with constructive notice of what knowledge their attorneys possessed, is, that if two parties employ the same attorney *to transact one business in which both have an interest,* (as a scrivener in drawing deeds, or an attorney in drawing settlements, etc.,) then the knowledge which that attorney has, as the agent of one party in the common transaction, is presumptively the knowledge of the other party also. It is contrary both to justice and sound policy to extend this rule. (See Paley on Agency 262 and notes.)

4. But the information of Scribner's claim which was given to Kasson would not, if actually communicated to the Bank, have affected their title by the levy.

It appears that after Scribner had informed Kasson, while he was acting as attorney for Cook, Lane & Corning, that the debt against Rathbone, was his; that the land belonged in equity to him, and that he claimed to be entitled to a conveyance of it, Kasson stated such claim of Scribner's to Cook, Lane & Corning, and they entirely denied its validity, and claimed to have the sole ownership and control of the land. Kasson, therefore, had no notice in fact of Scribner's equitable interest, as he was bound to believe in and follow the directions of his clients rather than those of a stranger.

Suppose at the time the Bank applied to Kasson to make the attachment, he had informed it that the record title was in Cook, Lane & Corning, whose attorney he was, that one Scribner claimed to be the equitable owner of the judgment upon which the levy was made, and that he had communicated this claim of Scribner to his clients, who repudiated it, and claimed that they were the equitable as well as legal owners? This would not be such a notice of an outstanding equity as they were bound to regard.

Notice of an equitable title different from that shown by the record is held to affect purchasers and creditors upon the ground

that it is sufficient to put them upon inquiry of the owner of record as to the extent of his interest; but if he makes the inquiry, and is answered that the record title is also the equitable one, the purpose of the notice is answered. He may then go by the record; *Spofford* v. *Weston*, 29 Maine 140; *Pomroy* v. *Stearns*, 11 Metc. 244; *Curtis* v. *Munday*, 3 Id. 405; *Rogers* v. *Jones*, 8 N. H. 264.

REDFIELD, Ch. J. This is a bill in equity to compel the defendants to release to the plaintiffs their title to certain lands in Burlington. The plantiffs' title is derived from one Scribner, by assignment by deed, with one witness, duly acknowledged and recorded, which is doubtless sufficient to convey an equitable title. The defendants' title is by levy of execution against Cook, Lane & Corning. Scribner's claim of title grew out of his being the factor of Cook, Lane & Corning, for the sale of glass, with a *del credere* commission, and having sold to Benjamin Rathbone to the amount of some seventeen hundred and sixty dollars, and he being, or becoming, insolvent, Cook, Lane & Corning, learning of his having land in Burlington, made an attachment and levy upon it, with the understanding that it was to be ultimately for Scribner's benefit, should he pay the debt upon his guaranty, and for their own security, until he did pay that and all other debts he should owe them.

Scribner made arrangements for payment, and endorsed notes which when paid were to be in full, before the levy, and which were paid before Rathbone's equity in the land expired, and probably before the levy. But the creditors claimed a mistake in the settlement, and some other deficiencies in his accounting to them, and it was understood between them and Scribner, that they had the right to retain the title to the land, until paid all that Scribner owed them, they claiming, at different times, from one hundred dollars to five or six hundred dollars. But on a reference to the master, in this case, it was reported that nothing is due them. The court are not prepared to say from the testimony in the case, that there is any such evidence of mistake or misapprehension by the master as to justify setting aside the report. We think there is not.

It must be assumed then, that at the time of the levy, by the defendants, the equitable estate in the land was in Scribner; and that Cook, Lane & Corning held the legal title, as a naked trust for Scribner; having in fact no lien upon it, but a claim only, which was not well founded.

The question then arises, whether it was subject to be levied upon by their creditors; and whether Scribner's equity could thus be defeated, upon the assumption that such creditors had no actual knowledge of the existence of such equity ?

There can be no doubt, we think, that in the case of a mere sale and conveyance of land by the absolute owner, without notice, either actual or constructive, or any change of possession, the land is still subject to levy, or attachment, upon the debts of the vendor. And the same is true of the sale of personal property, even after notice and the payment of the price, as has been held in this State by repeated decisions of this court. In that respect we give attachments an advantage above purchasers, who have paid the price of the articles, knowing of a former *bona fide* sale, and the payment of the price, but without any change of possession between the vendor and the vendee. And from the analogy between the change of possession in the case of personal property by the delivery of possession by the vendor to the vendee, and its necessity in all cases of sale, pledge, mortgage or assignment, in order to protect it from attachment, and that of transferring possession of real estate by the delivery and recording of a deed, which comes in the place of *livery of seizin*, it has sometimes been supposed that all land was liable for the debts of the party in whom was the legal title, at the time of the levy, or attachment, unless the creditor had knowledge of the equitable title being in another.

But we think no such doctrine is fairly deducible from our statutes in regard to conveyances and the levy of executions. All that seems fairly to be deduced from these statutes, in regard to this subject, is, that in the sale of lands, the deed shall be of no force until acknowledged and recorded, except as between the parties. And this exception has, by construction, been extended to privies, or those who have knowledge of the deed. This statute seems expressly to provide, that in such cases, the deed

whether absolute or conditional, by way of mortgage, shall have no effect upon any one except the parties, or privies, until recorded. And if the deed is to have no effect, the contract could have no greater effect, since it is the writing only which gives it any operation in regard to the title of land ; and being reduced to writing this merges the prior stipulations, so that no trust is thus created which can be recognized and enforced, aside from the deed, without a virtual repeal of the registry system.

But where a party proposes to take advantage of the literal application of the provisions of the registry system to perpetrate fraud, by levying upon the land, or purchasing it, after he has knowledge of an unregistered deed, the law interferes, by mere construction, and engrafts an exception, not named in the statute, but which it is necessary to imply, in order to defeat the fraudulent use of the provisions of the statute, which it is always safe to presume that the legislature did not intend.

So too if the party has constructive, or implied notice of an unregistered deed, he is not permitted to acquire a title from the grantor, which shall override it. As if he find the grantee in possession of the premises, or is informed of any other fact, which would naturally put a careful and prudent man upon inquiry, in a direction where he might obtain information in regard to the title, and he omit to pursue the inquiry ; and some other similar cases.

It must be admitted that these exceptions, to a certain extent, infringe the symmetry of the general object and purpose of the registry of deeds. That undoubtedly was, to enable every one to know where to look for the title of land. And there are many instances, no doubt, where the courts of equity even will allow a trust estate in lands to pass by the deed of the trustee, to one who becomes a *bona fide* purchaser, without notice, and pays the full price. But even in regard to purchasers the courts of equity are vigilant, to see that such purchaser shall not be allowed to take any benefit resulting from any want of care and watchfulness. If there exist any circumstances of suspicion, whereby he might be said to be fairly put upon his guard, and he neglects to follow out the inquiry, he is affected with notice of all facts,

which such inquiry would have brought to his knowledge, and if he purchase with his eyes shut, he acquires only the title of his grantor impeded with its attendant equity.

But if nothing of this character exists, it is regarded as more in conformity to just principles of equity and fair dealing, that the estate of the *cestui que trust* should be extinguished by the deed of the trustee, than that the equal equity of the purchaser should be defeated, and thus the free and fair transmission of estates be embarrassed and placed under a cloud of suspicion and doubt. The equities of the parties being equal, the legal estate is allowed to prevail, and a rule of policy is at the same time subserved, by leaving the transmission of titles unembarrassed, as far as practicable, thus inspiring confidence, rather than distrust, in the transmission of titles to real estate.

But this rule of policy has its limits. It should not be carried to the extent of working fraud and injustice upon others. And it is certainly a question of some difficulty to determine how far this rule of policy, by which the *bona fide* purchasers of trust estates are protected in their titles, can fairly be applied to a levying creditor. It must depend mainly upon the point, whether a creditor has the same, or as high an equity as a *bona fide* purchaser for value. There was a time, within my distinct recollection, when it was considered in this State, that the equity of a creditor was, in some respects, superior to that of a purchaser. It was understood that a purchaser after notice of a prior sale, being a volunteer, was not entitled to much indulgence, but that a creditor being already committed beyond recall, might stand upon the literal interpretation of the registry act, and treat the deed as wholly inoperative, except as between the parties, even when he had notice of it. And when it was decided by this court, that a creditor, who had knowledge, either actual or constructive, of the existence of a prior conveyance, could not hold the estate, by attachment and levy, it was at first looked upon as somewhat of an innovation upon the generally received notions, even among the profession. But that was very readily acquiesced in, being recommended by such obvious equity and justice. We are now asked to say that a levying creditor has not as much equity as a purchaser for value, without notice. And there is

certainly great reason to so regard the matter. This question is altogether aside of any question, affecting the endorsement of negotiable paper in payment of, or as security for a pre-existing debt. That rests upon the peculiarly negotiable quality attaching to the security. No such quality is attached to the assignment of personal chattels, as security for a debt. The assignee only takes the title of the assignor, subject to all equities, outstanding in other parties.

And in some respects this court has already established a distinction between the equities of creditors and purchasers, in favor of the latter. We held many years ago, that where a purchaser obtains goods by a fraudulent purchase, void between the parties to the contract, as where the goods are purchased under false pretences, that a *bona fide* purchaser of the fraudulent vendee for value, will acquire good title, as against the former vendor, but that an attaching creditor only comes into the precise place of the debtor, and must show his title good against the former owner. This doctrine has been repeatedly affirmed by this court, and is now fully established and generally acquiesced in. *Poor* v. *Woodbury*, 25 Vt. 234 ; *Fitzsimmons* v. *Joslin*, 21 Vt. 129. We are not aware that it was adopted by the court, or has been received by the profession or the people, with any doubt or distrust.

And in a late case in the county of Addison, *Hackett* v. *Callender et al.* 32 Vt. 97, which was alluded to in the argument, it was decided that an attachment of land upon the debt of one holding the record title, created no equity, which would stand in the way of the equitable owner of the estate, even where the creditor had no knowledge of such equity. And if the attachment of the estate by one having no knowledge of the trust, creates no title superior to that of the *cestui que trust*, neither would the levy, as it seems to us. For it is a settled principle of the law of attachment, that when the levy is completed, the title dates from the attachment, and is the same as if the levy had been completed at the very date of the attachment. It is not easy to make any appreciable distinction between the attachment and the levy, as to the equity thereby created, except that which results from the amount of expense incurred. For the levy being

by mistake upon land, not the property of the debtor, is no satis-faction of the debt. The only change then in the condition of the parties is the accruing of cost. This, we think, could scarcely be regarded as placing the creditor in the situation of a *bona fide* purchaser. This is not different in principle from the incurring of costs in levying upon personal property, which the debtor holds in trust, as in the case of an executor or administrator, where the power to sell exists; and where a *bona fide* purchaser, for value, even with notice of the trust, will acquire good title, since it is the duty of the trustee to make sale, and the purchase is therefore no violation of the trust, and will not therefore defeat the title. But nevertheless no title could be acquired by a levy of execution, upon such trust property, for the personal debt of the trustee, even by a creditor of such trustee who had no knowledge of the trust. *Williams* v. *Fullerton*, 20 Vt. 346.

It is obvious therefore, that the mere fact that a creditor has incurred expense, *bona fide*, and without notice of any counter equity, in levying upon trust property, does not make him a pur-chaser, or give him the same equity, as a purchaser. The rea-son of the distinction in the case of the executor or administrator is more obvious perhaps, than in some other cases, since there the duty of the executor 'may be to sell the property, and the purchaser may fairly conclude that the price will supply the place of the property, in carrying into effect the trust. But we apprehend the same rule would be applied to other cases of trust property of a personal nature, where it might be a violation of the trust to sell it. The purchaser without notice would acquire valid title, while a purchaser with notice might make himself tortiously a trustee, at the election of the *cestui que trust*, and a creditor, levying upon the trust property without notice, would acquire no title.

And the same rule prevails in England, and in many of the American States, as to the levy of an execution, a judgment lien, or an *elegit* upon real estate, held in trust by the debtor. This is not questioned by any one, and was very properly conceded in the argument of this case. This is very perspicuously stated in Lord St. Leonard's last edition of The Law of Vendors and

Purchasers of estates, 423, and is supported by some American cases.

It has been urged with great plausibility, that to hold trust estates not liable to a levy of execution upon the debt of the trustee, where the creditor has no knowledge of the trust, will be such a modification of the proposed benefits of a thorough registry of land titles, as very essentially to lessen their practical importance and advantage. But by admitting the notice of the trust to defeat the right of creditors to levy upon the trust estate, we depart wholly from the strict application of the rule that the registry is to conclude all land titles. There are numerous other well established departures from the strict application of the results of the registry, as the conclusive evidence of land titles. The implied notice of one's title, whether legal or equitable, resulting from possession, is of this character. The exceptions are established to prevent fraud and injustice. And it is certainly very much calculated to encourage both, when we allow the estate of one to be taken for the satisfaction of the debt of another, unless it be in cases where the debt was created in faith of the title of the estate being in the apparent owner. This argument *ab inconvenienti* is one of very frequent occurrence. It has an air of plausibility, but is not practically of a very conclusive character, since every general rule must have its exceptions. And it requires far more study and reflection, and far more wisdom and experience to determine the exceptions which are proper and necessary to be allowed in regard to all general rules, than it does to define or to defend the rule itself. And we think it very obvious that it was not the purpose of the statute establishing the registry of land titles in this State, to have it apply with absolute and unbending uniformity to all cases. The sense of justice, the very instinct of right and of fair dealing revolts at any such application of the registry system. And if any case can fairly be excepted from its operation it should be that of a clear trust, whether express or implied. A trust resulting from paying the consideration, as in the present case, and in every case where a judgment in the name of another, and not of the real creditor or owner, is levied upon land, is as much entitled to protection from

being taken upon the debts of the trustee as an express trust for charity, or any other purpose, and defined by deed not recorded, or other writing.   It can make no difference what is the nature of the trust,   And as this case stands upon the report of the master, it was a naked, dry trust, in the hands of Cook, Lane & Corning.

We see therefore no other course, but to decree a release of the title by the defendants, unless we are prepared to admit that all trust estates are liable for the debts of the trustee, unless the trust appears upon the face of the deed, as registered, or is otherwise known to the creditors.   And we see no reason why we should adopt this rule, which does not apply, with equal force to a levy upon personal property, held in trust, or to the case of a mere attachment of real estate held in trust, by a creditor not informed of the trust, both of which have been held to create no title as against the real owner, legal, or equitable, as the case may be, while in both cases, it is admitted that a *bona fide* sale for value is valid to convey the title clear of all equities outstanding in others.

The statute defining estates, subject to levy of execution, uses a phraseology, in regard to the debtor's title, *as being in his own right*, which is strongly indicative of the sense of the legislature, as not intending to make trust estates liable for the debts of the trustee.   It is true this form of expression will be satisfied by giving it an application to such trust estates, as are so defined upon the registry, or such as are known to be trust estates by the creditor.   But if such had been the only purpose of the statute, it is certainly remarkable that it should have been expressed in this general and unqualified form, making estates of the debtor *held in his own right only*, subject to levy of execution.

In every view we can take of the question we think it more in accordance with the principles of equity law, both in this country and in England, and more consistent with the decisions of this court upon the analogous subjects already referred to, to hold that this estate, being a mere naked trust, was not subject to the levy of execution against the trustee, holding the legal title for the benefit of another.

And in doing this we have no apprehension that we are doing

injustice in the particular case, or that we are establishing a rule, which will be likely to work injustice in other cases.

The present case may be taken as a fair illustration of the general application of the rule here established. There is no certain evidence that the creditors had positive knowledge of the trust. That must be so in all cases, or it will defeat the effect of the levy beyond all question. But here, as in most cases, it is certain the creditor by the slightest inquiry in the proper quarter, and in the quarter where one would naturally look, might have learned the true state of the title. The debtor's attorney, who held the possession of the estate for his use, knew of the claim of the *cestui que trust*, and the ground of it. Any inquiry of him would have led at once to the discovery of the real facts in the case. This was not done. But he was adopted as the attorney of the creditor to make the levy and he was taken of course, *cum onere*, that is, with his present knowledge of the title. That he was bound to communicate to the creditors, as much as if he had originally received it, while acting as the defendant's agent. For Scribner, the *cestui que trust*, having given him notice of some claim on his part, and this the attorney admits, if that still remained in the mind of the attorney, it surely did not need to be repeated by Scribner to become notice to the defendants. This is clearly the present English rule and one which seems reasonable and just.

But there is no great doubt, in my mind, that Mr. Kasson did communicate this knowledge, whatever it was, to the bank. He says indeed as much. But neither he nor the bank supposed the fact was as it turns out to be, that Scribner was the real owner of the land. But they might have learned enough to show that this might be so. They are therefore affected with notice to that effect, and being so, they are bound to abide the result of the judicial inquiry upon this point by the master.

Decree of chancellor affirmed, and remanded to court of chancery.