PENNSYLVANIA CO. FOR INSURANCE ON LIVES AND GRANTING ANNUITIES v. UNITED RAILWAYS OF HAVANA & REGLA WAREHOUSES, Limited.

No. 1480.

District Court, D. Maine, S. D.

Feb. 8, 1939.

Verrill, Hale, Dana & Walker, of Portland, Me., Saul, Ewing, Remick & Saul, of Philadelphia, Pa., and Wright, Gordon, Zachry & Parlin, of New York City, for plaintiff.

Cook, Hutchinson, Pierce & Connell, of Portland, Me., and Louis B. Wehle, of New York City, specially for defendant.

McLean, Fogg & Southard, of Augusta, Me., for intervenors.

Merrill & Merrill, of Skowhegan, Me. (Davis, Polk, Wardwell, Gardiner & Reed, of New York City, of counsel), specially for the motion.

PETERS, District Judge.

This is an action in assumpsit commenced by a writ which issued out of the Superior Court for Kennebec County dated August 14, 1937, returnable to the October term, when it was removed to this court by the usual proceedings.

The plaintiff is a Pennsylvania corporation doing business there. The defendant is an English corporation, having its principal office in London, engaged in business in Cuba.

The suit was brought to recover certain installments of rent alleged to be due from the defendant in a considerable amount, the ad damnum in the writ being three million dollars.

The suit was begun by attachment, and the officer's return is to the effect that on August 25, 1937, he attached, as the property of the defendant, "all its shares and interest in the capital stock of the American & Foreign Power Company Inc.", a Maine corporation, domiciled here but largely doing business elsewhere. At the time of the attachment there stood of record in the name of the defendant on the books of the American & Foreign Power Company Inc., 79,000 shares of its 7% preferred stock.

Within the time limited for filing pleadings the defendant filed in this court two motions to quash and dismiss the writ, declaration and attachment. One motion denied jurisdiction on the ground that there was no valid attachment of property, as well as no personal jurisdiction, and alternatively asked dismissal on the ground that the court should not take jurisdiction on account of the inconvenience to the parties of trying the issues in this forum. The second motion to quash and dismiss was on the ground that the plaintiff was not the owner of the cause of action set out in the writ. The latter motion, referred to by counsel as the short motion, was not pressed, and, on August 5, 1938, counsel for defendant filed a motion that they have leave to withdraw it. The motion for leave to withdraw is opposed.

The motion to dismiss for lack of jurisdiction set out various pledges and liens held by parties in England against the attached shares, certificates for which were in their possession; and the holders of these claims having made demands on the attaching officer in Maine to release the attachment or pay the claims, summonses were issued from this court directing the claimants to appear and answer concerning the nature and validity of their claims as provided by the Maine statute. After such service as could be effected the claimants appeared specially by attorneys and moved to quash and dismiss these summonses, three in number, and these motions are before the court.

So there are now before this court to be acted upon, three motions, or sets of motions, to wit: (1) the motion that leave be granted to withdraw the so-called short motion to dismiss, (2) the motion to dismiss for lack of jurisdiction, and also asking dismissal on the ground of forum non conveniens, and (3) the motions to quash and dismiss the summonses issued to the persons claiming liens on the property attached. These motions will be considered in the order mentioned.

### (1) The Motion for Leave to Withdraw the Shorter Motion to Dismiss.

Counsel for plaintiff object to withdrawal on the ground that the motion asked to be withdrawn is of such a nature that when filed it amounted to a general appearance in behalf of the defendant, to lose the benefit of which would be the loss of a valuable right by the plaintiff.

■ It apparently is conceded that granting permission to withdraw this motion is a matter of judicial discretion. Assuming that the motion had the effect claimed by the plaintiff, it seems to be settled, at least in this district, that the court may permit the withdrawal of a general appearance, in its discretion, under its equitable powers, when deemed necessary in the interest of justice. Jenkins v. York Cliffs Improvement Company, C.C., 110 F. 807.

Whether or not the filing of the motion effected a general appearance by the defendant and submission to the jurisdiction of the court (a question disputed by the parties) it is not necessary to decide. There is no question, I believe, that it was not intended to have that effect.

Briefly, the circumstances are as follows: On November 30, 1937, the defendant by counsel appearing specially for the purpose, filed simultaneously the two motions to quash and dismiss. The only jurisdiction that the court had obtained, up to that time, was by the attachment of the shares of stock standing in the name of the defendant on the books of the American & Foreign Power Co. Inc., a Maine corporation. The defendant made no appearance in the state court except for the purpose of having the action removed to this court. Within the required time after removal the defendant and the other interested parties began their campaign to have the attachment invalidated and the action dismissed for consequent lack of jurisdiction. The first ground for dismissal in the so-called long motion is "because this court had no jurisdiction of either the person or property of the defendant." Facts were alleged in support of the claim of invalidity of the attachment. The shorter motion to quash and dismiss gave the following reasons: "Because, as is apparent from the plaintiff's writ and declaration and the exhibits attached thereto, the plaintiff * * * is not the owner of the cause of action, if any, set out in the plaintiff's writ and declaration and which forms the basis of the pending suit, and also because the cause of action, if any, described in the plaintiff's writ and declaration has never passed to and become the property of the plaintiff."

Numerous and lengthy affidavits have been filed in support of the allegations in the longer motion.

■ The shorter motion has never been presented to the court for action, nor had it come to the attention of the court until July 6, 1938, when arguments were made on the longer motion, directed to the jurisdiction of the court. In the course of those arguments, which were oral, to be followed by briefs, counsel for plaintiff made some inquiry as to the basis of the contention in the short motion, and its withdrawal was rather casually mentioned; but the court received no impression that there was then any claim that the defendant had, by any act, directly or indirectly, already submitted to the jurisdiction which it was so vigorously contesting.

Defendant's counsel have consistently contended from the beginning that no jurisdiction was acquired by attachment, and apparently have used every effort to prevent their client being subjected to the jurisdiction of this court or any court in Maine.

To hold the defendant to an unintended and unexpected result of an act which was supposed to be consistent with its known attitude might be justified if it had caused the plaintiff in any way to change its position; but that does not seem to be the case. Nor has the plaintiff been misled.

The filing of the short motion is said by plaintiff to be inconsistent with opposition to jurisdiction. If so, it indicates that the defendant committed a technical error. To allow the motion will withdraw nothing from the plaintiff that had been obtained through any foresight or effort on its part. To disallow the motion would deprive the defendant of rights which it may regard as vital to its safety and welfare, and would work an injustice.

The motion to withdraw is allowed.

### (2) Motion to Dismiss for Lack of Jurisdiction.

In this motion the defendant, appearing specially for the purpose of making it and objecting to the jurisdiction of the court, recites that the shares in the American & Foreign Power Company, Inc., attached on

the plaintiff's writ, were at and before the date of attachment held in England under certain pledges and liens, and prays as follows: "The Defendant therefore contends that inasmuch as all of the said stock was and is in London, England, impressed with prior liens and charges under the laws of the United Kingdom, was and is subject to the jurisdiction of the courts of the United Kingdom of Great Britain and Northern Ireland and has been by the order of the Chancery Court thereof ordered delivered to a receiver appointed by said Court, in which Court the receivership proceedings are now pending, the said shares of stock are not legally subject to attachment by process within the State of Maine or within this District, and that this Court having no jurisdiction over any property of the Defendant by this alleged attachment and any jurisdiction which it might possibly have acquired having been divested by the appointment of a receiver by the English Court having jurisdiction of such shares, the alleged service made upon the Defendant should be quashed and the Plaintiff's writ and declaration should be dismissed for want of jurisdiction."

In support of this and other motions, as well as in opposition thereto, there has been filed a mass of documentary evidence consisting of copies from the records of English courts, affidavits, stipulations, opinions of English lawyers, and other items, all of which I understand are before the Court, without objection as to the form or method of presenting the evidence, to be considered in disposing of the questions presented.

On its petition for leave to intervene in the proceedings, the American & Foreign Power Company, Inc., was, on January 31st, 1938, permitted to do so and ordered to make no transfer of any of the attached shares and to pay no dividends until further order of court.

There seems to have been accomplished what counsel for plaintiff refer to in one of their briefs as "the salutary one of bringing all claimants to the attached res, —in this case 79,000 shares of the 7% preferred stock of American & Foreign Power Company Inc.,—before the court in one proceeding to see who has the paramount right."

To measure the value of various claims made by the parties, it is necessary at the outset to consider a fundamental question of law, which is

**Whether Hypothecated Shares of Stock in a Maine Corporation are Attachable under the Laws of Maine.**

So far as the reported cases show this question has never been decided.

In the absence of a statute no shares of stock in a corporation are attachable. Drake on Attachment, #244. It is stated in 7 C.J.S. Attachment, § 79, at page 253: "Stocks of a domestic or foreign corporation were not subject to levy at common law and hence, in the absence of an enabling statute, are not liable to attachment."

Up to the time enabling statutes were passed, Maine did not recognize attachments of any kind of personal property mortgaged or pledged. Sargent v. Carr, 12 Me. 396.

In Athol Savings Bank v. Bennett, 203 Mass. 480, 487, 89 N.E. 632, 636, the Supreme Judicial Court of Massachusetts says: "In the first place, the general rule is that, in the absence of a statute, personal property subject to pledge cannot be attached or taken on execution."

The statute under and in accordance with the provisions of which the attachment here was made, as stated by counsel for plaintiff, is Section 28 of Chapter 95 of the Revised Statutes of Maine, 1930 Revision, which reads as follows: "When the share or interest of any person in an incorporated company is attached on mesne process, an attested copy of the writ with a notice thereon of the attachment, signed by the officer, shall be left with the clerk, cashier, or treasurer of the company; and such attachment is a lien on such share or interest, and on all accruing dividends; and if the officer having the writ exhibits it to the official of the company having custody of the account of shares or interest of the stockholders, and requests a certificate of the number held by the defendant, and such official unreasonably refuses to give it, or wilfully gives him a false certificate thereof, he shall pay double the damages occasioned by such refusal or neglect; to be recovered against him in an action on the case by the creditor."

Unless the word "interest" is to be taken as equivalent to "equity of redemption", it is obvious that there is nothing in the wording of the above section of the statute purporting to authorize an attachment of the right to redeem shares from an hypothecation.

An equity of redemption in any kind of personalty not being attachable at common law, it follows that statutory authority must be found for such an attachment, to have it valid. It was never the law that a statute giving the right to attach property carried the right to attach the right to redeem it from a mortgage or pledge. They are two different things.

In Sargent v. Carr, 12 Me. 396, it is said by the Court, in 1835, following the Massachusetts case: "In Badlam v. Tucker et al., 1 Pick. 389 [11 Am.Dec. 202, 1823], the Court say, that it is only by statute, that equities, or rights to redeem, are subject to attachment by ordinary process; and that no statute has authorised the attachment of such an interest in personal property."

If the Legislature had intended by the statute above quoted to authorize attachment of an equity of redemption it is quite clear that it would have said so, as it did in the cases of other property when attachment of equities was first authorized and created as a new right.

The plaintiff, however, suggests that the word "interest" in the above quoted section is significant and indicates that the language used contemplates the attachment not only of the entire share of stock but of something else, such as an equity interest therein. But the result of the diligence of counsel in tracing the legislative history of this word in this connection shows beyond doubt that it was never intended or used to embrace a right to redeem shares from an hypothecation, commonly referred to as a pledge. The term seems to have been first used by the Legislature in Maine in the first statute passed after the Separation. Section 1, Chapter 60, of the Public Laws of 1821, provided that: "The share or shares or interest of any person in any turnpike, bridge, canal or other company, which heretofore has been or hereafter may be incorporated, with all the rights and privileges appertaining to such shares, may be attached on mesne process and taken in execution."

In the same section it so happened that the Legislature provided that: "All rights of equity in redeeming lands mortgaged, reversions or the remainders, shall be liable to attachment upon mesne process."

The apt words used to authorize attachment of equities in real estate and the lack of such language in connection with shares of stock is significant.

The sense in which the word "interest" was used in this chapter of the early laws is also shown by section 8 of the same chapter which was as follows: "Sec. 8. Be it further enacted, That whenever an officer, having a writ of attachment or execution against any person interested in any such company, shall exhibit to the Clerk or Cashier thereof, such writ or execution, and request a certificate from him of the number of shares or amount of interest owned by the debtor in such company, it shall be the duty of such Clerk or Cashier to give the said officer a certificate of the number of shares or amount of interest holden and owned by the debtor in such company, and therein express the numbers or other marks by which such shares or interest are distinguished."

It is clear that the word "interest" refers to a fractional ownership in the corporation and not to any equity of redemption.

An examination of the old statutes referred to by defendant's counsel is convincing to the effect that the word "interest" as used in the present statute is an historical relic of earlier forms of corporate organization denoting fractional ownership otherwise than by shares of stock, and never was used to mean or to include an equity of redemption. In fact, the word is still used with its original meaning. Section 14 of Chapter 98 of the Revised Statutes of 1930, provides: "The officer of the company having the care of the records or account of shares, or interest of the stockholders, shall, on exhibition to him of the execution, give the officer holding it a certificate of the number of shares held by the judgment debtor, or of the amount of his interest, under the penalty provided in section twenty-eight of chapter ninety-five."

It is obvious that a clerk of a corporation, in giving a certificate "of the amount of his interest", as required by the above section, could give no information beyond the number of shares standing of record in the name of a defendant.

But the plaintiff makes the alternative contention that hypothecated shares may be attached under the provisions of Sections 44 and 45 of Chapter 95 of the Revised Statutes of Maine, which read as follows:

"Sec. 44. *Attachment of personal property mortgaged, pledged, or under lien.* * * * Personal property not exempt from attachment, mortgaged, pledged, or

subject to any lien created by law, and of which the debtor has the right of redemption, may be attached, held, and sold as if unencumbered, subject to the provisions of the following six sections."

"Sec. 45. *When officer attaching mortgaged property is exempt from suit.* * * * When personal property, attached on a writ, or seized on execution, is claimed by virtue of such mortgage, pledge, or lien, the claimant shall not bring an action against the attaching officer therefor; (a) until he has given him at least forty-eight hours' written notice of his claim and the true amount thereof; (b) if the officer or creditor within that time discharges the claim by paying same or tendering the amount due thereon; (c) within that time restores the property; (d) or where the property was attached on a writ or seized on execution while in the hands or possession of the mortgagor, the attaching creditor within that time summons the claimant to answer in the same action such questions as may be put to him relative to the consideration, validity, and amount due secured by such mortgage."

■ While the last quoted sections of the statute refer to "personal property" generally, there are good reasons for thinking that shares of stock were not intended to be included in that designation.

Sections 44 to 50, inclusive, of Chapter 95 all relate to the same subject matter, the attachment of mortgaged personal property. Nowhere in the sections are shares of stock mentioned, and the language leads to the conclusion that the provisions of the section are limited to tangible personalty. Section 45 speaks of restoring the property and refers to the "attached goods". Section 47 speaks of "restoring" the attached "property", as if from physical possession, and again refers to the "attached goods".

It is somewhat significant that since 1835, when the statute was first enacted, there are to be found no cases in Maine indicating that it was ever used in an attempt to attach an equity of redemption in shares of stock.

In Massachusetts, where the Maine statute apparently originated, it is held that the provisions of a similar statute in regard to the attachment of personal property subject to a mortgage, pledge or lien, apply only where there is an attachment of goods by actual seizure, and have no application to an attachment of shares of stock in a corporation.

In Athol Savings Bank v. Bennett, 203 Mass. 480, 89 N.E. 632, 634, shares of stock which were held as security for a loan were attached or, as the Court qualified the word, "an attempt was made to attach them", and the bank took proceedings which would be appropriate if the statute in regard to attachment of mortgaged personal property was applicable. But the Court said: "But it is settled that Rev.Laws, c. 167, §§ 69, 70, apply only where there is an attachment of goods by seizure of them. Putnam v. Cushing, 10 Gray [Mass.], 334. They are not applicable in case of an attachment of shares of stock, and for that reason it is not necessary to point out that the bill in equity did not purport to be a demand under Rev.Laws, c. 167, §§ 69, 70."

The above sections 69 and 70 of the Massachusetts Statute referred to were as follows:

"Section 69. Personal property of a debtor which is subject to a mortgage, pledge or lien, and of which the debtor has the right of redemption, may be attached and held as if it were unencumbered, if the attaching creditor pays or tenders to the mortgagee, pledgee or holder of the property the amount for which it is so liable within ten days after demand as hereinafter provided.

"Section 70. The mortgagee, pledgee or holder shall, when demanding payment of the money due to him, state in writing a just and true account of the debt or demand for which the property is liable to him and deliver it to the attaching creditor or officer. If the same is not paid or tendered to him within ten days thereafter, the attachment shall be dissolved, the property shall be restored to him and the attaching creditor shall be liable to him for any damages he has sustained by the attachment."

The plaintiff argues that there is a difference between the Maine and the Massachusetts statutes which affects the applicability of the Massachusetts decision above quoted from; but the only difference is that the Massachusetts statute deals with mortgaged "personal property of a debtor", while the Maine statute refers to the debtor's mortgaged personal property "not exempt from attachment", an unimportant difference which does not touch the principle involved in the decision.

The matter of sub-headings, titles and groupings of sections of the statutes, referred to by counsel as showing the intention of the Legislature, I cannot regard as of much significance, in view of the fact that they are made up by revisers of the statutes knowing that the law specially provides that such things shall not be regarded as legal provisions.

I am driven to the conclusion that there has been no statute passed in Maine permitting the attachment of hypothecated shares in a Maine corporation, and that such an attempted attachment would be of no effect.

### The Status of the Shares Involved.

In order to determine whether the attachment here has validity, we must consider the status of the shares which were the subject of the attachment.

The foundation for the jurisdiction of this court is the action of the deputy sheriff in making an attachment on the writ which issued from the state court August 14, 1937. To the extent of the property held by that attachment the state court had jurisdiction and, upon removal, this court acquired the same jurisdiction, the plaintiff losing no rights under its attachment on account of the removal.

Upon making his application to the clerk of the American & Foreign Power Company, Inc., for an account of the number of shares held by the defendant in that company, under Section 28 of Chapter 95 of the Maine Statutes,—the attaching officer was informed that 79,000 shares of the $7 preferred stock stood in the name of the defendant. It seems that nothing on the books of the Power Company showed any incumbrance on the shares and there is nowhere recorded in Maine any mortgage, pledge or other lien upon them. It develops from the evidence, however, that there are claims of liens against the shares held by parties in England under the following circumstances:

The defendant acquired the 79,000 shares in question about 1927 as a part of the price for which it sold to the Electric Bond & Share Company an electric lighting property in Cuba. At the time this property was sold it was under mortgage in part to trustees to secure an issue of so-called 5% Irredeemable Debenture Stock, and in part to trustees under an indenture creating an issue of what is referred to as the 4% Debentures and Debenture Stock, both issues having been created some years prior to the sale of the lighting plant in Cuba. When the property sold was released from the operation of the trust deeds securing the two classes of securities it was stipulated, with the sanction of the English court having jurisdiction, that, out of the American & Foreign Power Company stock to be acquired by the sale, 36,453 shares should be delivered to the trustees of the 4% debentures and 13,197 shares to the trustees of the 5% debentures, in substitution for property released by them from the operation of the trust deeds.

Accordingly, the 79,000 shares of American & Foreign Power exchanged by Electric Bond & Share for the property purchased were divided into three lots, the certificates being issued in the name of the defendant, and were delivered in New York,—36,453 shares to agents of the trustees of the 4% debentures, 13,197 shares to agents of the trustees of the 5% debentures, and 29,350 shares to agents of the defendant, all certificates being shortly thereafter transmitted to England to the defendant where the certificates for 36,453 shares and the 13,197 shares were endorsed in blank by the defendant and redelivered to the respective trustees who have held possession of the certificates in England ever since as a part of the security behind the debentures.

The history and status of the block of 29,350 shares is another and more complicated matter and must be considered separately.

### The 29,350 Shares and the Floating Charge.

The certificates for the block of 29,350 shares, on delivery in New York, became a part of the assets of the defendant and, after being transmitted to England, were deposited in the Westminster Bank of London for account of the defendant. Somewhat later the certificates were indorsed in blank and used as collateral for loans by the defendant. The loans were all paid by 1932 and the certificates redelivered to the defendant and by it redeposited in the Westminster Bank for the account of the defendant, where they were at the time of the attachment and where they remained until December, 1937, when upon application of the trustees of the 5% Debentures a receiver was appointed by the English court for the balance of the 79,000 shares not specifically pledged, and thereupon the indorsed

certificates for 29,350 shares were turned over to the custody of the receiver by whom they have been held ever since under the authority of the English court.

The basis for the English receivership and order which resulted in turning over the certificates to the receiver was the fact that long prior to the acquisition of these shares by the defendant it had given to the trustees of the 5% Debentures, in addition to specific security, a general claim, lien or mortgage, called in England a "floating charge", upon all its assets both then owned and all such that should be thereafter acquired, the applicable paragraph in the trust deed being as follows: "7. The Company hereby charges (subject as hereinafter mentioned) in favor of the Trustees or Trustee the whole of its assets and undertaking for the time being both present and future including its uncalled capital but exclusive of the property expressed to be charged by the next two succeeding clauses hereof with the payment of all moneys for the time being owing on the security of these presents and such charge shall rank as a floating charge. * * *"

The trust deed appears to have been duly recorded in England.

When the 29,350 shares were originally acquired by the defendant they became a part of its general assets, in exchange for assets sold, and, by the terms of trust deed, subject to the floating charge, the nature and effect of which must be considered.

While not known to the law of Maine, the floating charge has been defined and its effect described by the courts of England where that particular form of security seems to be not uncommon. Counsel on both sides have submitted references to English reports and quotations therefrom, and stipulated that reports of English decisions may be used in determining the law of that country relative to floating charges.

Definitions much quoted, and relied upon by both sides, are those of Lord Macnaghten, in the cases of Governments Stock Investment Co. v. Manila Ry. Co. Ltd., [1897] A.C. 81, and Illingsworth v. Houldsworth, [1904] A.C. 355, in which he says:

"A floating security is an equitable charge on the assets for the time being of a going concern. It attaches to the subject charged in the varying condition in which it happens to be from time to time. It is of the essence of such a charge that it remains dormant until the undertaking charged ceases to be a going concern, or until the person in whose favor the charge is created intervenes. His right to intervene may of course be suspended by agreement. But if there is no agreement for suspension, he may exercise his right whenever he pleases after default."

"* * * I should have thought there was not much difficulty in defining what a floating charge is in contrast to what is called a specific charge. A specific charge, I think, is one that without more fastens on ascertained and definite property or property capable of being ascertained and defined; a floating charge, on the other hand, is ambulatory and shifting, in its nature, hovering over and so to speak floating with the property which it is intended to affect until some event occurs or some act is done which causes it to settle and fasten on the subject of the charge within its reach and grasp."

When the event occurs or the act is done which causes the floating charge to "settle and fasten" on its subject, the floating charge is described by the English courts as having "crystallized."

The effect of a floating charge is described by Cozens-Hardy, J., in Wallace v. Evershed, [1899] 1 Ch. 891, in which he says: "What is the precise effect of a 'floating security' of this nature? Does it create a present charge, or is there no effective charge until the debenture-holders apply for a receiver? I think the true view is this. A floating security gives an immediate equitable charge on the assets, subject to a right to the company in the ordinary course and for the purposes of the business of the company, but not otherwise, to dispose of the assets as though the charge had not existed, and if and when the event upon which the capital money is made payable has happened the holder of such a debenture can obtain a receiver and thus enforce his security." In re Standard Mfg. Co., [1891] 1 Ch. 627; In re Opera, Ltd., 3 Ch. 260.

The above two cases were referred to in London Pressed Hinge Company, [1905] 1 Ch. 576, by Justice Buckley in an interesting and informative opinion too long to be quoted here.

It is clear that the "floating charge", so-called in England, is a recognized, valid form of security under the law of that

country. It is what might be called here an equitable lien, a continuing charge on the assets of the company creating it, but permitting the company to deal freely with the property in the usual course of business until the security holder shall intervene to enforce his claim, whereupon the lien or charge becomes fixed or crystallized and the company which gave it has no further authority to deal with the property, nor can general creditors take it.

Up to the time the security holder intervenes the property may be sold or mortgaged by the debtor company (unless specifically forbidden by the deed of trust) and apparently the property may be taken and sold on execution against the debtor company, but a sale on execution, to be effective, against the holder of the charge, must have taken place before his intervention. A sale on execution made after intervention, although seizure occurred before, is not effective. Our attachment on mesne process, or a similar proceeding in England, would have no effect unless, possibly, the actual sale on execution occurred before intervention. In re Standard Mfg. Co., 1 Ch. 627; In re Opera, Ltd., 3 Ch. 260; In re London Pressed Hinge Co., 1 Ch. 576, above referred to.

In Taunton v. Sheriff of Warwickshire, 2 Ch. 319, the English Court, per Lindley, L. J., said: "Who, then, are entitled to this money? What are the rights of the debenture-holders under their securities? Their debentures certainly gave them an equitable charge on the assets, and a right, when the moneys payable under the debentures were due, to obtain the appointment of a receiver. They obtained the appointment of one before the goods were sold, and the duty of the sheriff, therefore, was not to sell; it having been decided in In re Opera, Limited, that the rights of debenture-holders prevail against an execution creditor at all events until sale."

In the case presented here of an attachment of property subject to a floating charge which was crystallized after the attachment was made, no execution having issued, it is apparent, I think, that the English Courts would hold that the plaintiff's attachment was destroyed by the subsequent proceedings,—the so-called lien of the attachment being defeated by the superior equity.

There has been introduced in evidence in affidavit form the opinion of Mr. Edward Newton, a solicitor of the city of London, a practitioner obviously of experience and standing, in which he states that, having familiarized himself with the facts in this case, he gives his opinion that the title of the trustees to the shares covered by the floating charge here involved, including the 29,350 shares referred to, "would under English law prevail against the claim of any execution creditor who had not completed his execution by actual sale before the application to the court for the appointment of the said receiver."

I consider it established that the 36,453 shares specifically pledged to the trustees of the 4% Debentures and the 13,197 shares specifically pledged to the trustees of the 5% Debentures were held by the respective trustees, at the time of the Maine attachment, under claims valid by English law as against any attempted attachment or seizure on execution; and that the 29,350 shares, certificates for which were, at the time of the attachment, in the possession of the defendant, were subject to the floating charge in favor of the trustees of the 5% Debentures, which charge, by proceedings for crystallization, subsequently became a valid, fixed and specific pledge in favor of the trustees, which, under English law, took precedence of all other claims including any claims attempted to be enforced by attachment or similar process.

Recognition of the English Claims.

Are these claims against the shares which are valid under English law entitled to recognition and enforcement in an American court?

At this point it is necessary to more clearly distinguish between ownership of a share in a corporation and the evidence of such ownership, referred to as the certificate of stock.

It is well settled that the title to the certificate depends upon the law of the place where it is. Direction Der Disconto-Gessellschaft v. United States Steel Corporation, 267 U.S. 22, 45 S.Ct. 207, 69 L. Ed. 495.

The certificates of stock in this case, long before the attachment and ever since, have been in England subject to valid claims against them (for more than they are worth, according to the evidence) and those claims must be recognized everywhere.

The plaintiff contends, however, that the shares have a situs in Maine sufficient

to support an attachment here which, when made under the authority of the statute, creates a lien on the shares superior to a claim on the certificates valid where the certificates are.

The extent to which ownership of the certificates carries ownership in the corporation is determined by the law of the state where the corporation was incorporated, in this case Maine.

The statutes of Maine cover the matter by Section 43 of Chapter 56, R.S. of Maine 1930, which reads as follows: "Sec. 43. *Transfer; how made.* * * * When the capital of a corporation is divided into shares, and certificates thereof are issued, they may be transferred by indorsement and delivery. The delivery of a certificate of stock of a corporation to a bona fide purchaser or pledgee for value, together with a written transfer of the same or a written power of attorney to sell, assign, and transfer the same, signed by the owner of the certificate, shall be a sufficient delivery to transfer the title against all parties. * * *"

The statute authorizing the attachment of shares provides, by Section 28 of Chapter 95, R.S., 1930, that "When the share or interest of any person in an incorporated company is attached on mesne process, an attested copy of the writ with a notice thereon of the attachment * * * shall be left with the clerk * * * and such attachment is a lien on such share or interest, and on all accruing dividends * * *."

The plaintiff's attachment was made while the assets of the defendant were covered by the floating charge, but some two months before the crystallization was effected, and the plaintiff claims that under the provisions of the statute above quoted it has obtained a lien, at least on 29,350 of the shares, that will support any subsequent judgment as from the date of the attachment.

The lien created by the Maine statute, however, is not a fixed lien, displacing outstanding equities, but merely holds for the purpose of a possible judgment such interest as the defendant may have. This is well established by the Maine cases cited by the defendant.

In Crooker v. Crooker, 46 Me. 250: "On the other hand, where there are outstanding equities or trusts, which a court of equity will enforce, the attaching creditor is not regarded as acquiring by force of

his attachment merely any right which is in its nature higher than the equitable rights which exist. These will be regarded as subsisting until the attachment is perfected by a judgment and levy, notwithstanding the creditor may have had no knowledge of their existence when his attachment was made. * * * Outstanding equities are regarded as higher in their nature than the legal estate."

In Ex parte Foster, 9 Fed.Cas. p. 508, No. 4960, Mr. Justice Story said: "Now, an attachment does not come up to the exact definition, or meaning of a lien, either in the general sense of the common law, or in that of the maritime law, or in that of equity jurisprudence."

The Maine court has always taken this view of an attachment.

In Houghton v. Davenport, 74 Me. 590, at page 594, the court quoted with approval the following language from a Vermont case, Hackett v. Callender, 32 Vt. 97: "The attaching creditor merely seeks to secure an old debt. He advances nothing upon the strength of the record title. He is not made worse by relying upon it. The omission of the real owner to record his deed has not injured the creditor or been the means of depriving him of any value. It is for these reasons that courts generally have treated them as standing upon equities materially different."

In Maine a creditor does not get a property right by attachment.

In Bangor v. Goding, 35 Me. 73, 56 Am.Dec. 688, the court said: "If the lien be an incumbrance upon the estate, it is no more so than a common attachment made by a creditor of the estate of his debtor; and that is clearly a part of the remedy provided for the collection of his debt."

The laws of Maine control matters of transfer of title to and creation of liens against shares of stock in domestic corporations. Maine has by statute (Sec. 43, Ch. 56) provided that the delivery of a certificate with a written transfer to a bona fide pledgee for value shall be sufficient to transfer title against all persons. No discrimination is made against nonresidents. The claimants here are bona fide pledgees for value. No doubt a Maine statute could have provided that an attachment of shares in a Maine corporation should displace prior equitable claims, but it did not do so. The attachment authorized and the "lien" created by it were given no higher standing or different meaning than had been given

them by the Maine courts for years before the statute was passed.

For many purposes the so-called "situs" of shares in a corporation is in the home state, but in Maine at least, as between stockholder and third parties, the situs is identified with the certificate. An attachment of shares of stock in a Maine corporation made on the books of the corporation is subject to the rights of those who have acquired title to and liens upon the shares by dealing in the certificates.

A leading case much discussed by both parties is the Disconto-Gesellschaft case above referred to, 267 U.S. 22, 45 S.Ct. 207, 69 L.Ed. 495; also D.C., 300 F. 741. In this case Mr. Justice Holmes uses the following language, the case being very much in point: "Therefore New Jersey having authorized this corporation like others to issue certificates that so far represent the stock that ordinarily at least no one can get the benefits of ownership except through and by means of the paper, it recognizes as owner anyone to whom the person declared by the paper to be owner has transferred it by the indorsement provided for, wherever it takes place. It allows an indorsement in blank, and by its law as well as by the law of England an indorsement in blank authorizes anyone who is the lawful owner of the paper to write in a name, and thereby entitle the person so named to demand registration as owner in his turn upon the corporation's books. But the question who is the owner of the paper depends upon the law of the place where the paper is. It does not depend upon the holder's having given value or taking without notice of outstanding claims but upon the things done being sufficient by the law of the place to transfer the title. An execution locally valid is as effectual as an ordinary purchase. Yazoo & Mississippi Valley R. Co. v. Clarksdale, 257 U.S. 10, 42 S.Ct. 27, 66 L.Ed. 104. The things done in England transferred the title to the Public Trustee by English law." [267 U.S. 22, 45 S.Ct. 208.]

The plaintiff doubts the applicability of the Disconto-Gesellschaft case to the situation here and gives various reasons, but I find nothing in the statutes of Maine or in the situation of the parties which makes inapplicable the general principle of that case that the holder of the record title to the stock does not have a title good against the owner of the certificate.

I conclude that the English receiver has a good title to the endorsed certificate for 29,350 shares, and that his title to the shares should be recognized by this court as superior to any interest acquired by the plaintiff under its attachment.

The plaintiff contends that the English "floating charge" is repugnant to the public policy of Maine and should be given no effect here for that reason.

I can find no formulation of the policy of Maine definite enough to require the nullification of foreign-acquired rights and the suspension of the normal operation of the principles of conflict of laws.

The floating charge, as such, is not known in Maine, although I believe it is across the border in Canada, but the equitable principles which are the foundation of the floating charge have always been recognized in Maine, where a chattel mortgage on after-acquired property constitutes an equitable lien. The Maine court in Burrill v. Whitcomb, 100 Me. 286, 299, 61 A. 678, 683, 1 L.R.A.,N.S., 451, 109 Am.St.Rep. 498, in sustaining an after-acquired property clause, said: "Nor is it apparent that such a contract respecting after-acquired property is in contravention of any established rules of public policy."

The plaintiff, like the defendant, is a non-resident of Maine, and as such is not entitled to extra-territorial operation in his favor of the public policies of Maine, even if there were any such as claimed. United States v. Belmont, 301 U.S. 324, 332, 57 S.Ct. 758, 81 L.Ed. 1134.

Industry of counsel for plaintiff has evolved several other reasons for rejecting the foreign claims to the shares and in support of the alleged superiority of the lien of the attachment, unnecessary to consider here in detail, but not having sufficient merit, in my opinion, to prevent the application of the general principles which seem to me controlling in favor of the claimants.

The result is that I find the two blocks of 36,453 and 13,197 shares to be the subject of valid, specific pledges, made before the date of the attachment and to which this court must give preference over the attachment; and that the block of 29,350 shares was made subject to the floating charge before the attachment which was displaced by the subsequent enforcement or crystallization of the charge.

It follows that the attachment must be quashed because it was destroyed by the previous pledges and the crystallization of the floating charge.

If it should be considered that the attachment of the 29,350 shares was not invalid when made for the reason that if crystallization had not followed, a sale of the attached property on execution might have been effective before proceedings to enforce the charge were commenced,— nevertheless the attachment should be discharged, because it is now, after crystallization, displaced by a superior title.

■ An attachment in the ordinary case where the court has jurisdiction over the person will not be dissolved on account of lack of title to the attached property in the defendant; but the situation is different where the jurisdiction wholly depends upon the attachment. The jurisdiction is destroyed when the attachment is destroyed, or shown to be invalid.

The following is quoted from the opinion in La Varre v. International Paper Co., D.C., 37 F.2d 141, 143, the opinion of the District Court therein quoting from Mr. Justice Woods in Greenwood Grocery Co. v. Canadian County, etc. Co., 72 S.C. 450, 52 S.E. 191, 2 L.R.A.,N.S., 79, 110 Am.St.Rep. 627, 5 Ann.Cas. 261, as follows: "The general rule is that an attachment will not be dissolved, on the ground that the defendant has no title to the property, or that it is the property of the plaintiff. The defendant's lack of interest in the property would affect the title of the purchaser under the attachment but not the validity of the process. * * * But it is manifest this reasoning does not apply where the court obtains jurisdiction of a non-resident by virtue of the attachment of his or its property in the state. In such case, the jurisdiction and the validity of the attachment depend upon the defendant having property in the state, and if this fact does not appear it is fatal."

It follows that the motion to quash the attachment and dismiss the proceeding for lack of jurisdiction must be granted.

### (3) Motions to Quash and Dismiss the Summonses.

In May, 1938, trustees of the Debentures above referred to caused to be served on the deputy sheriff who made the attachment in August, 1937, notice of their claims on the shares aggregating some thirty-five million dollars, and demanded that the officer pay the claims or discharge the attachment; and in June of the same year the receiver above referred to caused a similar notice to be served as to his claim of a somewhat larger amount; and following these notices to the officer the plaintiff caused to be issued out of this court summonses to the trustees and to the receiver commanding them to appear and answer questions as to the validity and amount of their claims. These steps were taken in pursuance of the statutes of Maine of 1930, Section 45 of Chapter 95, which applies to the case of personal property attached on a writ and claimed by virtue of a mortgage, pledge of lien.

It is contended in behalf of the claimants, the trustees and the receiver, who held this large indebtedness and the pledges of the stock in part security therefor, that the statute referred to did not apply, but that even if applicable it was not complied with by the plaintiff; and that if the attachment was not originally void as claimed it was rendered null and void by the plaintiff's failure to take the steps provided by the statute it invoked. It is not, however, necessary to go into this feature of the case for the reason that I have sustained the contention of the claimants as to the original attachment, and the attachment having been quashed and the suit dismissed for lack of jurisdiction the summonses may also be quashed and dismissed as they have no further usefulness.

Orders will be entered accordingly.