**CAROLINA POWER & LIGHT COMPA-NY, a corporation, Plaintiff,**

v.

**URANEX, a "groupement d'interet economique," Defendant.**

No. C–77–0123 RFP.

United States District Court,
N. D. California.

Sept. 26, 1977.

On Motion for Partial Reconsideration
Dec. 9, 1977.

Edward A. Morris, Bronson, Bronson & McKinnon, San Francisco, Cal., William E. Graham, Jr., Legal Dept., Carolina Power & Light Co., Raleigh, N. C., for plaintiff Carolina Power & Light Co.

James J. Brosnahan, William A. Helvestine, Morrison & Foerster, San Francisco, Cal., Michael K. Stanton, Weil, Gotshal & Manges, New York City, for defendant Uranex.

## OPINION

PECKHAM, Chief Judge.

In 1973 Carolina Power & Light Company ("CP&L"), a North Carolina public utility company, contracted with defendant Uranex for the delivery of uranium concentrates to CP&L during the period 1977 to 1986. Uranex is a French *groupement d'interet economique* that markets uranium internationally. Following the recent and dramatic rise in the price of uranium fuel in the world market, Uranex either would not or could not deliver at the contract price, and requested renegotiation. CP&L has refused to enter any discussions aimed at contract modifications.

Earlier this year CP&L filed the present action against Uranex, and proceeded *ex parte* to attach an 85 million dollar debt owed to Uranex by Homestake Mining Company ("Homestake"), a San Francisco based corporation that markets uranium throughout the United States. The 85 million dollars is due to Uranex pursuant to a uranium supply contract between Homestake and Uranex, and has no relationship to the present litigation except as a potential source for CP&L to satisfy any judgment that might issue. But for the attachment the funds would have been transferred out of the country in the ordinary course of business.

The contract between CP&L and Uranex provides that disputes are to be submitted to arbitration in New York. At the time this lawsuit was filed CP&L sought to compel Uranex to enter arbitration. Since that time, however, Uranex voluntarily has entered arbitration and those proceedings are now going on in New York. Both parties agree that because of the arbitration agreement this court cannot adjudicate the merits of the dispute, but CP&L contends that the court should stay this action and maintain the attachment in order to protect any award that CP&L might receive in the New

York arbitration. CP&L claims that Uranex has no other assets in this country with which to satisfy a judgment, and Uranex apparently does not dispute this proposition. Uranex has moved the court on several grounds to dismiss the complaint and quash the writ of attachment.

## I. JURISDICTION

Uranex seeks to dismiss this action for lack of jurisdiction over the person. CP&L originally contended that this court had both *in personam* and traditional *quasi in rem* jurisdiction, although as will be discussed below, CP&L now takes a different approach in arguing that this court has some form of *quasi in rem* jurisdiction. There appears to be no real dispute over the following facts concerning Uranex's activities in California:

(1) Uranex is not licensed to conduct business in California, and has no office, no employees, no warehouse, no mailing address, no telephone, and no bank account in California. The 85 million dollars due Uranex from Homestake was to be wired from Homestake's bank in San Francisco to Uranex's bank in France.

(2) Uranex's contract with Homestake, a San Francisco based corporation, provides that the uranium will be shipped to Illinois and Oklahoma. Uranex has never sold products for use in California, never shipped products into California, and has never had a contract with any company connected with California besides Homestake. In fact, Uranex has no contracts with any United States corporations except CP&L and Homestake.

(3) Over five years ago Uranex solicited business from several California companies, but these contracts never went beyond the most preliminary stages. No solicitation of business in California has been made by Uranex since that time.

(4) Uranex subscribes to NUEXCO, a service published in Palo Alto, California, which monitors the state of the world uranium market. Also, Uranex representatives attend the annual Atomic Industrial Forum in San Francisco. Obviously, none of the underlying issues in the litigation between Uranex and CP&L has any connection with Uranex's limited activities in California.

Pursuant to Rule 4(d) of the Federal Rules of Civil Procedure, the federal courts may employ the personal jurisdiction statutes of the states where they sit. Section 410.10 of the California Code of Civil Procedure, the California "long arm" statute, simply provides that:

A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or the United States.

Accordingly, the only question to be resolved is whether or not the assertion of jurisdiction over Uranex comports with minimum constitutional standards.

First, it can only be concluded that Uranex's limited contacts with the State of California will not support the assertion of *in personam* jurisdiction under the constitutional standards of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Uranex's activities in California are far below any level that might be considered an ongoing presence within the jurisdiction, or that might support the assertion of general jurisdiction over any and all causes of action against the defendant. Furthermore, the claims involved in this litigation have no connection whatsoever with Uranex's activities in California.

At the time of the hearing on these motions, CP&L argued that this court could in any event assert *quasi in rem* jurisdiction over the debt due Uranex from Homestake. Under traditional theories of jurisdiction that argument was undoubtedly correct. *See Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Harris v. Balk*, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905). Since the hearing, however, the Supreme Court has issued its decision in *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), in which the Court radically altered the constitutional standard by which assertions of jurisdiction over property are to be measured:

The case for applying to jurisdiction *in rem* the same test of "fair play and substantial justice" as governs assertions of jurisdiction *in personam* is simple and straightforward. It is premised on recognition that "[t]he phrase, 'judicial jurisdiction over a thing,' is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing." Restatement (Second) of Conflict of Laws § 56, introductory note. This recognition leads to the conclusion that in order to justify an exercise of jurisdiction *in rem*, the basis for jurisdiction must be sufficient to justify exercising "jurisdiction over the interests of persons in a thing." The standard for determining whether an exercise of jurisdiction over the interests of persons is consistent with the Due Process Clause is the minimum contacts standard elucidated in *International Shoe*.

. . . .

. . . For the type of *quasi in rem* action typified by *Harris v. Balk* . . . accepting the proposed analysis would result in significant change. These are cases where the property which now serves as the basis for state court jurisdiction is completely unrelated to the plaintiff's cause of action. Thus, although the presence of a defendant's property in a State might suggest the existence of other ties among the defendant, the State, and the litigation, the presence of the property alone would not support the State's jurisdiction. If those other ties did not exist, cases over which the State is now thought to have jurisdiction could not be brought in that forum.

. . . .

. . . "[T]raditional notions of fair play and substantial justice" can be as readily offended by the perpetuation of ancient forms that are no longer justified as by the adoption of new procedures that are inconsistent with the basic values of our constitutional heritage. . . . The fiction that an assertion of jurisdiction over property is anything but an assertion of jurisdiction over the owner of

the property supports an ancient form without substantial modern justification. Its continued acceptance would only serve to allow state court jurisdiction that is fundamentally unfair to the defendant.

We therefore conclude that all assertions of state court court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny.

*Id.* at 206, 97 S.Ct. at 2581–85. The Court then went on to decide that Delaware's assertion of *quasi in rem* jurisdiction under its stock sequestration statute, which premised jurisdiction only on the legal presumption that the stock of all Delaware corporations was located in Delaware, could not meet these constitutional standards.

■ As described above, Uranex's contacts with California do not afford an adequate basis under *International Shoe* to support an assumption of *in personam* jurisdiction by this court. Since *Shaffer v. Heitner* has abrogated *quasi in rem* jurisdiction as a separate and insular conceptual category, the determination that this court lacks *in personam* jurisdiction might appear to resolve the entire jurisdictional issue. Plaintiff CP&L, however, points to the following passages in the *Shaffer* opinion:

The primary rationale for treating the presence of property as a sufficient basis for jurisdiction to adjudicate claims over which the State would not have jurisdiction if *International Shoe* applied is that a wrongdoer

"should not be able to avoid payment of his obligations by the expedient of removing his assets to a place where he is not subject to an in personam suit." Restatement (Second) of Conflicts § 66, comment a.

. . . .

This justification, however, does not explain why jurisdiction should be recognized without regard to whether the property is present in the State because of an effort to avoid the owner's obligations. Nor does it support jurisdiction to adjudicate the underlying claim. At

most, it suggests that a State in which property is located should have jurisdiction to attach that property, by use of proper procedures, as security for a judgment being sought in a forum where the litigation can be maintained consistently with *International Shoe.*

*Id.* at 209, 97 S.Ct. at 2583. Plaintiff argues that this language creates an exception to the application of *International Shoe,* and that this court has jurisdiction to maintain the attachment pending resolution of the merits of the controversy in the New York arbitration proceeding.

Plaintiff's novel argument has substantial merit. The Supreme Court's opinion leaves no doubt that any assertions of jurisdiction, without exception, must meet the constitutional standards of "traditional notions of fair play and substantial justice." The language pointed to by plaintiff, however, clearly acknowledges that there will be circumstances where, without some form of jurisdiction to attach property, courts would be powerless to protect a litigant from the concealment or evacuation of his opponents assets. Certainly in the circumstances of this case, the Full Faith and Credit Clause can provide no assurance of the value of any arbitral award or judgment plaintiff might receive in New York. More importantly, the Supreme Court's comments evidence an acknowledgement that there is a distinction between jurisdiction to adjudicate the underlying merits of the controversy, and "jurisdiction to attach . . . property, . . . as security for a judgment being sought in a forum where the litigation can be maintained consistently with *International Shoe.*" *Id.* at 209, 97 S.Ct. at 2583. As the Supreme Court itself acknowledged in *Shaffer, id.,* scholarly opinion has long advocated the development of precisely such a scheme of jurisdiction. *See e. g.,* Hazard, *A General Theory of State-Court Jurisdiction,* 1965 Sup.Ct.Rev. 241, 284–85; Von Mehren & Trautmen, *Jurisdiction to Adjudicate: A Suggested Analysis,* 79 Harv.L.Rev. 1121, 1178 (1966).

This court has concluded that in circumstances such as these a fair reading of the Supreme Court's opinion in *Shaffer v. Heitner,* requires that the application of notions of "fair play and substantial justice" include consideration of both the jeopardy to plaintiff's ultimate recovery and the limited nature of the jurisdiction sought, that is, jurisdiction merely to order the attachment and not to adjudicate the underlying merits of the controversies. In some circumstances, even limited jurisdiction to attach property would nonetheless violate standards of "fair play and substantial justice," for example, where the attached property was merely moving through the state in transit to another country. But where the facts show that the presence of defendant's property within the state is not merely fortuitous, and that the attaching jurisdiction is not an inconvenient arena for defendant to litigate the limited issues arising from the attachment, assumption of limited jurisdiction to issue the attachment pending litigation in another forum would be constitutionally permissible.

In this litigation CP&L has established acts by affidavit, in large part uncontroverted by defendant, that are adequate to support jurisdiction to order the attachment. As described above, Uranex apparently has no other assets within the United States, and Uranex's business appears unlikely to bring such assets into the country in the future.[1] San Francisco is the corpo-

---

1. If the courts of some other jurisdiction were able to obtain *in personam* jurisdiction over *both* Uranex and Homestake, then it would be appropriate for this court to dismiss the instant action and leave CP&L to its remedies in that jurisdiction. There appears to be little question that a federal district court with *in personam* jurisdiction over both the alleged debtor and the stakeholder could issue orders for security purposes that would have extraterritori-

al effect. *United States v. First Nat'l City Bank,* 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); *Fleming v. Gray Mfg. Co.,* 352 F.Supp. 724 (D.Conn.1973). Neither party, however, has suggested that there is any state where *in personam* jurisdiction could be obtained over both Homestake and Uranex. If the courts of another jurisdiction could obtain *in personam* jurisdiction only over Uranex, it is possible that an order running against Uranex

rate headquarters of Homestake, and the presence of the debt drives necessarily from the dealings between Homestake and Uranex. California is not an exceptional or inconvenient forum for Uranex to litigate issues that pertain to the 85 million dollar debt due from Homestake. In fact, Uranex had agreed to litigate in California any disputes that might arise in its dealings with Homestake.

The chief difficulty with the course outlined above is that there is at present no action against Uranex pending before any court with *in personam* jurisdiction. Arbitration has commenced in New York, but the attachment in this jurisdiction cannot be predicated on such informal proceedings. The arbitrator would not have authority to issue any attachment in New York, and until CP&L files an action seeking to resolve the underlying controversy Uranex cannot challenge that court's *in personam* jurisdiction. In the present posture of the litigation CP&L is left in the position of a litigant who seeks an attachment premised only on the promise that he will at some point file and prosecute the underlying action. Ordinarily such circumstances should require this court to dismiss the action and quash the attachment. The court, however, is mindful of the unique situation of this litigation. CP&L hardly can be faulted for failing to file simultaneous actions, for when this action was filed in January few attorneys would have doubted that this court would have *quasi in rem* jurisdiction to adjudicate the underlying controversy.

would also bind Homestake in the sense that Homestake could be an "aider and abettor" in the violation of the injunction if after notice of the injunction it simply transferred the funds to France. *South Cent. Bell Tel. Co. v. Constant Inc.*, 304 F.Supp. 732 (E.D.La.1969), *aff'd* 437 F.2d 1207 (5th Cir. 1971); Fed.R.Civ.P. 65. Such courts, however, would be unable to undertake civil contempt proceedings as to Homestake without personal jurisdiction, and after removal of the assets contempt procedures against Uranex would be an empty formality. The court is unwilling to send CP&L on this more hazardous procedural route.

2. Uranex also argues that a prejudgment attachment is inconsistent with the agreement of the parties. Article 11 of the contract between

Furthermore, any dismissal of this action undoubtedly would be stayed pending appeal by the plaintiff. Accordingly, given the exceptional circumstances of this litigation, the court will maintain the attachment, in the amount stated in part III of this opinion, for 30 days from the date of this order, during which time plaintiff CP&L must file an action directed to the underlying merits in a jurisdiction that has *in personam* jurisdiction over defendant Uranex.

## II. THE CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

In 1970 the United States became a party to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (hereafter cited as Convention), 9 U.S.C. §§ 201 *et seq.* (1970), which provides generally that member nations will enforce provisions for arbitration in international commercial agreements and recognize arbitral awards made in other member nations. France is also a contracting nation to the Convention. There is little question that the Convention would apply to the contract at issue in this litigation. As described above, both Uranex and CP&L agree that they must pursue arbitration in New York as provided in the arbitration clause of their contract. Uranex, however, argues that it would be inconsistent with the Convention for this court to maintain the attachment pending the arbitration.[2]

Uranex and CP&L, however, provides only that:

"*Arbitration*

Any controversy or claim arising out of this Agreement, or the breach thereof, which the parties are unable to settle by mutual consultation, shall be settled by arbitration by three impartial Arbitrators, all of whom shall be attorneys, in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrators may be entered in any court having jurisdiction thereof.

The arbitration shall take place in New York, New York."

Hence, prejudgment attachment can be considered inconsistent with the agreement only if one decides that such attachment is inherently

The Convention and its implementing statutes contain no reference to prejudgment attachment, and provide little guidance in this controversy. Article II of the Convention states only that a "court of a Contracting State . . . shall, at the request of one of the parties, refer the parties to arbitration." To implement this aspect of the Convention, section 206 of Title 9 provides that "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." The language of these provisions provides little apparent support for defendant's argument.

Uranex, however, relies upon the decisions of the Third Circuit in *McCreary Tire & Rubber Co. v. CEAT, S.p.A.*, 501 F.2d 1032 (3d Cir. 1974). In that case plaintiff McCreary Tire & Rubber Company, a Pennsylvania corporation, filed suit against CEAT, S.p.A., an Italian corporation, for alleged breaches of an exclusive distributorship contract. McCreary initiated the suit in Pennsylvania by attaching certain of CEAT's property. The underlying contract provided for arbitration of any disputes in Brussels, Belgium. McCreary previously had filed a virtually identical lawsuit in the United States District Court for the District of Massachusetts, and the Massachusetts court had stayed the lawsuit and ordered arbitration in accordance with the contract. Defendant CEAT removed the Pennsylvania litigation to federal court, but the Pennsylvania district court refused to grant defendant relief similar to that awarded by the Massachusetts court. On appeal, the Third Circuit held first that it had jurisdiction over the denial of the stay pending arbitration, but did not have jurisdiction over the denial of defendant's motion to dissolve the prejudgment attachment. Second, the court held that the Convention required the district court to issue the stay pending arbitration and that the district

court had no discretion in this respect. Finally, despite its jurisdiction determination, the court went on to decide that the Convention also required the dissolution of the attachment:

> [R]esort to a Praecipe and Complaint in Foreign Attachment in the Court of Common Pleas of Pennsylvania is a violation of McCreary's agreement to submit the underlying disputes to arbitration, and that the Convention obliges the district court to recognize and enforce the agreement to arbitrate. Quite possibly foreign attachment may be "available" for the enforcement of an arbitration award. This complaint does not seek to enforce an arbitration award by foreign attachment. It seeks to bypass the agreed upon method of settling disputes. Such a bypass is prohibited by the Convention if one party to the agreement objects. Unlike § 3 of the federal Act, article II(3) of the Convention provides that the court of a contracting state shall "refer the parties to arbitration" rather than "stay the trial of the action." The Convention forbids the courts of a contracting state from entertaining a suit which violates an agreement to arbitrate. . . . The obvious purpose of the enactment of Pub.L. 91–368, permitting removal of all cases falling within the terms of the treaty, was to prevent the vagaries of state law from impeding its full implementation. Permitting a continued resort to foreign attachment in breach of the agreement is inconsistent with that purpose. The relief requested, a release of all property from the attachment, should have been granted.

At least one district court has chosen to follow the rationale of the *McCreary* opinion in applying the Convention to prejudgment attachments. *See Metropolitan World Tanker, Corp. v. P.N. Pertambangan Minjakdangas Bumi Nasional (P.M. Pertamina)*, 427 F. Supp. 2 (S.D.N.Y.1975).

---

inconsistent with any agreement to arbitrate. In that sense defendant's argument premised on the contract is actually identical with defendant's argument premised on the Conven-

tion. Insofar as defendant's contractual argument might be considered separately, the court finds it to be without basis.

■ This court, however, does not find the reasoning of *McCreary* convincing. As mentioned above, nothing in the text of the Convention itself suggests that it precludes prejudgment attachment. The United States Arbitration Act, 9 U.S.C. §§ 1 *et seq.* (1970), which operates much like the Convention for domestic agreements involving maritime or interstate commerce, does not prohibit maintenance of a prejudgment attachment during a stay pending arbitration:

> After declaring (§ 2 [of the U.S. Arbitration Act]) such agreements [to arbitrate] to be enforceable, Congress, in succeeding sections, implemented the declared policy. By § 3 it provided that "if any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court . . . shall on application of one of the parties stay the trial . . . until such arbitration has been had" if the applicant is not in default in proceeding with such arbitration. The section obviously envisages action in a court on a cause of action and does not oust the court's jurisdiction of the action, though the parties have agreed to arbitrate. And, it would seem there is nothing to prevent the plaintiff from commencing the action by attachment if such procedure is available under the applicable law. This section deals with suits at law or in equity. The concept seems to be that a power to grant a stay is enough without the power to order that the arbitration proceed, for, if a stay be granted, the plaintiff can never get relief unless he proceeds to arbitration.

*Barge "Anaconda" v. American Sugar Refining Co.*, 322 U.S. 42, 44–45, 64 S.Ct. 863, 865, 88 L.Ed. 1117 (1944). *See also Murray Oil Products Co. v. Mitsui & Co.*, 146 F.2d 381 (2d Cir. 1944).[3] The *McCreary* court makes two rather elliptical comments to distinguish the United States Arbitration Act from the Convention. First, the court notes that the Arbitration Act only directs courts to "stay the trial of the action," while the Convention requires a court to "refer the parties to arbitration." 501 F.2d at 1038. From this difference the *McCreary* court apparently concludes that while the Arbitration Act might permit continued jurisdiction and even maintenance of a prejudgment attachment pending arbitration, application of the Convention completely ousts the court of jurisdiction. The use of the general term "refer," however, might reflect little more than the fact that the Convention must be applied in

---

3. In *McCreary* the Third Circuit commented that the approach taken in *Murray Oil Products Co. v. Mitsui & Co., supra,* was rejected "in a diversity context" by the Supreme Court in *Bernhardt v. Polygraphic Co. of America, Inc.,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956). This comment is inaccurate. *Murray Oil Products* concerned a contract in interstate commerce with an arbitration clause and the United States Arbitration Act clearly applied. On defendant's motion the district court had stayed the action pending arbitration, and after the arbitrators had found for the plaintiff, the district court entered summary judgment for plaintiff pursuant to the arbitral decision. Writing for the Second Circuit, Judge Learned Hand held that it was appropriate for the district court to enter summary judgment on the arbitral award without requiring plaintiff to initiate a separate action for confirmation of the arbitral award. With respect to this decision he observed that "[a]rbitration is merely a form of trial, to be adopted in the action itself, in place of the trial at common law . . . ."

146 F.2d at 383. He then went on to determine, as a second and separate issue, that the United States Arbitration Act allowed the district court to maintain a prejudgment attachment pending arbitration. In *Bernhardt v. Polygraphic Co. of America, Inc., supra,* the Supreme Court first determined that the contract in question did not involve interstate commerce, and hence that the rules of the United States Arbitration Act could not be applied directly as substantive law. The court also decided that rules concerning the validity of arbitration agreements were substantive and not procedural, and that therefore in a diversity case not involving interstate commerce state rules of law on arbitration were to be applied. It was in that context that the Supreme Court quoted and "rejected" Learned Hand's comment that arbitration was "merely a form of trial." None of the questions actually decided in *Murray Oil Products* were involved in *Bernhardt v. Polygraphic Co. of America, Inc., supra.*

many very different legal systems,[4] and possibly in circumstances where the use of the technical term "stay" would not be a meaningful directive. Furthermore, section 4 of the United States Arbitration Act grants district courts the power to actually order the parties to arbitration, but this provision has not been interpreted to deprive the courts of continuing jurisdiction over the action.

Second, the *McCreary* court found support for its position in the fact that the implementing statutes of the Convention provide for removal jurisdiction in the federal courts. *See* 9 U.S.C. § 205 (1970). The Third Circuit concluded that "[t]he obvious purpose [of providing for removal jurisdiction] . . . was to prevent the vagaries of state law from impeding its [the Convention's] full implementation. Permitting a continued resort to foreign attachment . . . is inconsistent with that purpose." It must be noted, however, that any case falling within section 4 of the United States Arbitration Act also would be subject to removal pursuant to 28 U.S.C. § 1441. Furthermore, removal to federal court could have little impact on the "vagaries" of state provisional remedies, for pursuant to Rule 64 of the Federal Rules of Civil Procedure the district courts employ the procedures and remedies of the states where they sit. Finally, it should be noted that in other contexts the Supreme Court has concluded that the availability of provisional remedies encourages rather than obstructs the use of agreements to arbitrate. *See Boys Market, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

In sum this court will not follow the reasoning of *McCreary Tire & Rubber Company v. CEAT, S.p.A., supra.* There is no indication in either the text or the apparent policies of the Convention that resort to prejudgment attachment was to be precluded.

---

**4.** There are over 50 contracting nations to the Convention, and "equally authentic" texts in five different languages. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Art. XVI.

**5.** Neither party has suggested that in its dealings with CP&L Uranex was acting as an agent

## III. OWNERSHIP OF THE ATTACHED ASSETS

Defendant Uranex maintains that in its dealings with Homestake it acted only as an agent for Compagnie General de Materiele Nucleonie ("COGEMA"), a French corporation owned completely by an agency of the French government, and that full ownership of the payment due from Homestake resides in its principle, COGEMA. Defendant supports this contention with affidavits of its own officials, with affidavits of COGEMA officials, and with a copy of the contract between Uranex and COGEMA. Uranex argues that under California law a creditor may attach and levy upon only his debtor's actual interest in property that the debtor holds; therefore CP&L may not attach funds that Uranex would receive only in its role as an agent.[5] Furthermore, Uranex argues that since the attached funds are actually the property of COGEMA, a corporation owned completely by an agency of the French government, the Foreign Sovereign Immunity Act of 1976, P.L. 94–583, 90 Stat. 2891, *et seq.*, requires this court to vacate the attachment.

The major point of contention between the parties is the characterization of the relationship between Uranex and COGEMA, and accordingly whether Uranex or COGEMA owns the 85 million dollars due from Homestake. Both parties agree that this question is to be resolved with reference to French law, which governs the contract between Uranex and COGEMA. Both parties also agree that under the contract Uranex is to act as a *"commissionnaire"* in the marketing of uranium products for COGEMA, and both parties have submitted affidavits concerning the meaning of this relationship pursuant to Rule 44.1 of the Federal Rules of Civil Procedure. Appar-

---

for COGEMA, and it will be assumed that in contracting with CP&L Uranex acted for its own account or for the account of some other principle. Obviously if COGEMA were the principle in both contracts, different problems would be presented.

ently, under French law a commission contract constitutes a special type of agency relationship, in which the *commissionnaire* enters contracts with third parties to buy or sell goods for the account of the principle, or "*commettant*." Between the *commissionnaire* and the *commettant* the relationship appears to differ little from the typical agency relationship in this country. In his dealings with third parties, however, the *commissionnaire* does not reveal the role or the identity of the *commettant*. The *commissionnaire* is personally bound in his contracts with third parties, and the *commettant* and the third party have no legal relationship and generally no legal recourse against each other.

CP&L argues that the peculiarities of a *commissionnaire* arrangement justify the conclusion that until the *commissionnaire* delivers the proceeds of its third party contracts to the *commettant*, those proceeds are the property of the *commissionnaire*. Therefore, CP&L maintains, these proceeds while still in the hands of the *commissionnaire* or the third party may be subjected to attachment and levy to fulfill debts of the *commissionnaire*, even if those debts are unrelated to its actions for the account of the *commettant*.

The affidavits of French law submitted by CP&L in support of this argument emphasize that the *commissionnaire* contracts with third parties in his own name, and argue that the payments under these contracts go into the "patrimony" of the *commissionnaire*. Although the *commissionnaire* is obligated to pay over these amounts to the *commettant*, CP&L's experts point out that the funds received from third parties are not "earmarked" and that the *commissionnaire* may meet his obligation to the *commettant* with other assets. The most telling point is the assertion by Bernard Bouloc that the third party may "set off" against its payments any claims it may have against the *commissionnaire*, even if those claims arise from transactions that the *commissionnaire* entered into on its own account.

The affidavits submitted by Uranex point to a series of features of the *commissionnaire -commettant* relationship that allegedly are inconsistent with the proposition that the *commissionnaire* "owns" the proceeds of commission sales. The most significant arguments concern the *commettant*'s rights in the event of the *commissionnaire*'s bankruptcy. Uranex notes that the *commissionnaire* never takes title to the goods deposited with him by the *commettant*. In the event of the *commissionnaire*'s bankruptcy the *commettant* may reclaim the goods in preference to any creditors of the *commissionnaire*, as long as those goods remain unsold. Apparently, this privilege does not attach to payments that the *commissionnaire* has received from a third party and intermingled with the *commissionnaire*'s other assets. It is not clear whether the bankruptcy of the *commissionnaire* allows the *commettant* to claim directly any unpaid amounts still due from third parties. The experts of both parties agree that before 1967 the *commettant* had this right, but at that time the relevant French statutes were revised. The experts are in disagreement over whether the *commettant* may exercise such a right under the present form of the statute. Finally, it should be noted that defendant's experts allege that the third party may set off against his payments to the *commissionnaire* any claims that the third party has against the *commettant*, a rule that implies that the unpaid price is to be regarded as the property of the *commettant*.

■ This dispute furnishes ample illustration of the difficulties that arise when courts must resolve issues deriving from foreign law. Both defendant and plaintiff can point to features of the commission contract that support their respective positions, but despite the excellent briefing that has attended this litigation, it is difficult to weigh the relative significance of these features without a broader understanding of the role that commission arrangements play in French commerce. Furthermore, important and relevant features of French law on commission sales apparently remain unresolved. Nonetheless, it is clear that the

commission contract between Uranex and COGEMA bears most of the characteristics of an agency relationship, and the court cannot conclude that Uranex "owns" the account payable due from Homestake. The most troublesome point advanced by CP&L is the above-described assertion by Bernard Bouloc that Homestake could "set off" against its payments any claims it might have against Uranex, even if unrelated to the instant transaction. This rule, however, can be harmonized with the conclusion that COGEMA owns the funds due from Homestake. Since the *commettant* deliberately conceals his role in the transaction from the third party buyer, it is not surprising that he would be held to that representation when the third party seeks to treat the *commissionnaire* as the principle of the transaction. No such policy, however, would extend to complete strangers to the commission contract, such as CP&L. Plaintiff has never suggested that in its dealings with Uranex it relied on the possibility of attaching funds due Uranex under the Homestake contract.[6]

▇ There is no serious dispute that under California law a creditor may attach only his debtor's actual interest in property that the debtor holds. *Kinnison v. Guaranty Liquidating Corp.*, 18 Cal.2d 256, 115 P.2d 450 (1941); *Hetrick v. Paris Jet, Inc.*, 64 Cal.App.3d 158, 134 Cal.Rptr. 285 (1976); *A. F. C., Inc. v. Brockett*, 257 Cal.App.2d 40, 64 Cal.Rptr. 771 (1967). CP&L may not attach any amounts due from Homestake that are to be paid over to COGEMA pursuant to the commission contract. Pursuant to Article VI of the contract between Uranex and

COGEMA, however, Uranex is to receive a commission of 1.5 percent of the amount invoiced for commission sales. Presumably a commensurate portion of the attached fund constitutes Uranex's commission, and CP&L may attach that portion of the fund. The amount of the attached fund, held in escrow and invested pursuant to stipulation of the parties, is $85,200,000, and Uranex's commission on this amount would be $1,278,000. Accordingly, the attachment will be vacated except as to the amount of Uranex's commission.[7]

▇ Pursuant to Federal Rule of Civil Procedure 62(a), execution of the judgment vacating the attachment in the amount indicated above automatically is stayed for 10 days from the date of entry of the judgment.[8]

### MEMORANDUM AND ORDER

### ON MOTION FOR PARTIAL RECONSIDERATION

Carolina Power and Light Company ("CP&L") filed this diversity action on January 18, 1977, for an anticipatory breach of contract or, in the alternative, for an order compelling arbitration of the dispute. On that date, CP&L obtained under California state law procedures made applicable by Rule 64 of the Federal Rules of Civil Procedure an *ex parte* writ of attachment on an 85 million dollar account payable from Homestake Mining Company ("Homestake") to Uranex. On September 26, 1977, this court filed its opinion vacating the attachment except for $1,278,000.00, which the court found to be the amount of Ura-

---

**6.** Plaintiff CP&L has suggested an alternative theory for maintaining the attachment. Uranex is a *groupement d'interet economique*, a type of business organization rather like a joint venture or partnership. COGEMA is a member of Uranex, and members of a *groupement* are jointly and severally liable for liabilities arising from its activities. CP&L argues that under that theory of liability the attachment may be maintained regardless of whether the attached funds are actually the property of COGEMA. Under California law, however, a partner may not be held personally liable unless he is served and brought into the action. *Promotus Enter-*

*prises Inc. v. Jiminez*, 21 Cal.App.3d 560, 98 Cal.Rptr. 571 (1971). CP&L has never made COGEMA a party to this action.

**7.** This determination makes it unnecessary to resolve the contentions surrounding the application of the Foreign Sovereign Immunity Act of 1976, P.L. 94–583, 90 Stat. 2891, *et seq.*

**8.** It is, of course, clear that an order vacating an attachment is a final order from which an appeal may be taken. *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950).

nex's commission. The court concluded that the remaining $83,922,000.00 belonged to COGEMA rather than to Uranex. On October 13, CP&L filed a motion for partial reconsideration of the opinion and for rehearing with respect to the issue of ownership of the 85 million dollar Homestake account.

First of all, Uranex does have standing to raise the issue of ownership of the attached property.[1] The burden is on Uranex, however, to prove that the 85 million dollar Homestake debt is not Uranex's property and that therefore the attachment should be vacated. Under Rule 24 of the Federal Rules of Civil Procedure, an intervenor has the burden to establish his interest in the property which is the subject of the action. *Levin v. Mississippi River Corp.*, 47 F.R.D. 294 (S.D.N.Y.1969). Similarly, under California law a third party claiming ownership in attached property has the burden of proof on the ownership question. California Code of Civil Procedure, § 689; *Butler v. Nepple*, 54 Cal.2d 589, 6 Cal.Rptr. 767, 354 P.2d 239 (1960) (en banc); *Wheelon v. Patco*, 258 Cal.App.2d 71, 65 Cal.Rptr. 533 (1968). Thus, if COGEMA were to intervene in this case and claim ownership of the attached Homestake debt, the burden would be on COGEMA to prove such ownership. Rather than COGEMA intervening and claiming ownership, however, as is the normal procedure in this type of situation, the issue of ownership is now before this court because the defendant Uranex has claimed *non-ownership*. Although neither Rule 24 nor § 689 is directly applicable to Uranex as the defendant, the issue of ownership now before the court is essentially the same as in the intervenor/third party claimant situation, and therefore the burden of proving non-ownership should be on Uranex just as the burden of proving ownership would be on the intervenor/third party claimant.[2]

In support of its contention that it was acting only as an agent for COGEMA in its dealings with Homestake and that ownership of the payment due from Homestake resides in COGEMA, Uranex has submitted affidavits of officials of both Uranex and COGEMA. In addition to these affidavits, Uranex has also submitted its contract with CEA, to which COGEMA succeeded, which established its *commissionnaire-commettant* relationship with COGEMA.

The Uranex-CEA contract, however, is not an exclusive arrangement. Uranex has the power to buy and sell uranium for its own account. Thus, the mere fact that Uranex and COGEMA have entered into a *commissionnaire-commettant* relationship does not necessarily mean that the Homestake transaction was entered into pursuant to that relationship.[3] Although the converse is also not necessarily true, the burden of proof is on Uranex to establish the ownership of the Homestake debt.

In considering the credibility of and ascribing weight to the COGEMA affidavit, this court may consider the fact that COGEMA, as a claimant to the attached property, is interested in the outcome of the case. *Sherwood v. Cornfield*, 216 Cal. App.2d 364, 370, 31 Cal.Rptr. 264 (1963). In addition, under the "adverse inference rule" as stated in *International Union (UAW) v.*

---

1. *Pennsylvania Co. for Insurance on Lives and Granting Annuities v. United Railways of Havana & Regla Warehouses*, 26 F.Supp. 379, 391 (D.Me.1939); *Beshara v. Goldberg*, 221 Cal. App.2d 392, 395, 34 Cal.Rptr. 501, 503 (1963) ("only person who had the right to contest the levy of the attachment was the defendant or some other interested party who has been permitted to intervene"); 7 C.J.S. Attachment § 426, at 612–13 (1937) ("where the attachment was resorted to in order to obtain jurisdiction, a nonresident defendant has been allowed to show his lack of interest in the property attached for the purpose of ousting the court of jurisdiction").

2. Placing the burden of proving non-ownership on the defendant is analogous to the statutory requirement that the defendant prove the applicability of any alleged exemptions. California Code of Civil Procedure §§ 482.100(c), 484.-070(a), (b), (g), 484.090(b), 484.360; see also California Code of Civil Procedure § 690.50(i).

3. California law contains a presumption that a person is acting for himself and not as an agent for another. *Flynn v. Ralph M. Parsons Co.*, 241 Cal.App.2d 181, 50 Cal.Rptr. 260 (1966).

*N. L. R. B.*, 148 U.S.App.D.C. 305, 312, 459 F.2d 1329, 1336 (1972), the failure of Uranex to produce relevant evidence within its control gives rise to an inference that the evidence is unfavorable to the defendant. Uranex, which has the burden of proof on this issue, has submitted no documentary evidence which shows that the specific Homestake transaction in question was for the account of COGEMA. Common sense indicates that there would be some documentation of who owned uranium worth 85 million dollars.[4]

██ Uranex has not met its burden of proving non-ownership of the Homestake debt, and the court will grant CP&L's motion for partial reconsideration of the opinion and for rehearing with respect to this issue.[5]

CP&L also contends that the evidence of record is insufficient to support a judgment vacating any portion of the attachment because Uranex has failed to supply data relating to expenses it incurred as a result of its transaction with Homestake. Paragraph 8 of the affidavit of Jacques Blanc, Secretaire General of COGEMA, states that "COGEMA is entitled to the entire purchase price for the uranium sold to Homestake except for Uranex's commission and *directly related expenses.*" (Emphasis added.) Uranex has failed to introduce any evidence of the expenses it incurred in connection with the uranium sale to Homestake. Because the court may find upon rehearing that the Homestake debt does indeed belong to COGEMA, Uranex should at this time also introduce evidence as to its "directly related expenses" resulting from the Homestake transaction.[6]

---

**4.** California Evidence Code § 412 provides:

If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust.

**5.** Because the court is granting CP&L's motion for partial reconsideration and rehearing, it will defer ruling on the other motions pertaining to the appeal.

**6.** Following this memorandum and order there was a period of several months during which additional testimony was presented to the court. The parties settled before the court made any final ruling.